BONE *v.* STATE.

4164 140 S. W. 2d 140

Opinion delivered May 13, 1940.

*Scipio A. Jones* and *Elmer Schoggen,* for appellant.

*Jack Holt,* Attorney General and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

HOLT, J. Appellants were convicted of murder in the second degree and their punishment fixed at 21 years in the state penitentiary. They were tried jointly on an information charging them with the murder of Mrs. John Deaver.

Appellants have appealed and assign six errors for our review.

(1) They first contend that the trial court erred in overruling their demurrer to the information. The ground for this demurrer was that the information was not signed by the prosecuting attorney. The record reflects that the information in question had on it the name of the prosecuting attorney, ''Fred A. Donham, Prosecuting Attorney,'' in print ''By John T. Williams, Deputy Prosecuting Attorney.'' ''John T. Williams'' was signed with a pen. Appellants contend that the use of a form for the information, on which the name of the prosecuting attorney was printed, does not amount to the signing of the name of the prosecuting attorney by his deputy, and, therefore, does not meet the requirements as laid down by this court in the recent case of *Johnson* v. *State,* 199 Ark. 196. We cannot agree. In that case this court said:

''It is true that it is generally said that a deputy prosecuting attorney, legally appointed, is generally clothed with all the powers and privileges of the prosecuting attorney, but he must file the information in the name of the prosecuting attorney. . . . The deputy, of course, may file information in the name of the prosecuting attorney, but he signs the name of the prosecuting attorney, and then his name as deputy.''

This exact question was before the supreme court of Oklahoma in *Hardin* v. *State,* 56 Okla. Crim. 440, 41 P. 2d 922. That court held that ''when the county attorney's name is affixed to the information in print or in typewriting and is then signed by his duly appointed assistant, such subscription of the name of the county

attorney is a sufficient compliance with the requirements of the statute. Section 2829, Okla. Stat. 1931.''

(2) Next appellants complain because the court refused to excuse by-stander juror, Buford Harris. After eleven jurors had been selected, and appellants had exhausted all but one of their challenges, five by-standers were called. When this list was called to answer questions by the clerk, F. A. Longley was third on the list and Buford Harris was fourth. The clerk testified that he called Harris first because he came into the courtroom first; that he had no preference of one juror over another. We think it clear that no error was committed here. Appellants were not entitled to the services of any particular juror. In matters of this kind the trial judge must necessarily exercise a wide discretion. No prejudice, or the denial of any material rights of appellants, appears here.

In *Sullivan* v. *State,* 163 Ark. 11, 258 S. W. 643, this court, with reference to the selection of trial jurors from the regular panel, said: ''These were matters over which the circuit judge must necessarily have a wide discretion. It is thoroughly settled that a defendant has no right to the services of any particular juror. He may only demand that he be tried before a fair and impartial jury, . . .''

(3) Complaint is next made that the trial court refused to call negroes for service on the by-standers' list of jurors after the regular panel had been exhausted. The record reflects that there were three called for jury service on the regular panel and three on the special panel. Forty-six men were examined.

It further appears that all by-standers called were white persons selected outside of the courtroom by the sheriff at the request of counsel for appellants. Mr. Harris, deputy sheriff, testified that he called men for jury service around town over the 'phone and did not know until the men reached court whether they were negroes or white persons, and that he had no prejudice against calling a negro. We think it clear that no discrimination against the negro, on account of his race or

color, in the selection of jurymen has been shown in this case.

In the case of *Bone* v. *State,* 198 Ark. 519, 129 S. W. 2d 240, a former appeal of this case to this court, it was said:

". . . Had these three negro electors been regularly placed upon the panel of the jury by the jury commissioners in the discharge of their duties, there could not have justly been any criticism on account of the fact that there might not have been a negro juror in the final trial of the case. We are attempting to make clear and emphasize the matter that the test lies not in the fact that there was no juror of the negro race upon the trial jury, but the vice is in an omission by administrative officers, jury commissioners, for instance, in the systematic exclusion of negroes from the regular jury panel. . . ."

We hold, therefore, that this assignment is without merit.

(4) Appellants next complain because the trial court permitted evidence of injury inflicted on John Deaver and Leslie Crosnoe during the fighting and after the shooting occurred. They objected to this testimony on the ground that appellants were not charged with an assault on Deaver but with the killing of his wife.

The court permitted the introduction of this testimony on the theory that it was part of the *res gestae,* and we think the court committed no error in so doing. The injuries to Deaver and Crosnoe were received in the course of the encounter in which they were engaged with appellants and during which Deaver's wife was killed.

In *Childs* v. *State,* 98 Ark. 430, 136 S. W. 285, this court said: "Under the law all that occurred at the time and place of the shooting which had reference thereto or connection therewith was part of the *res gestae. Byrd* v. *State,* 69 Ark. 537, 64 S. W. 270. *Res gestae* are the surrounding facts of a transaction, explanatory of an act, or showing a motive for acting. *Carr* v. *State,* 43 Ark. 99."

(5) Complaint is next made because the court gave an instruction permitting a verdict of first degree mur-

der against Rome Bone. It has been the long settled rule of this court that where defendant is convicted of a lesser crime than that with which he is charged, he cannot complain of any alleged error in instructions covering a higher degree of crime.

In the comparatively recent case of *Sanders* v. *State,* 175 Ark. 61, 296 S. W. 70, the rule is stated as follows: "Neither can appellant complain of the error in the giving of instruction number 9, relative to the offense of rape, since the jury acquitted him of that crime and convicted him of the lesser offense of carnal abuse, in which the questions of resistance and outcry of the female are not involved, and any error committed in the giving of said instruction was harmless. *James* v. *State,* 161 Ark. 389, 256 S. W. 372."

This assignment is, therefore, without merit.

(6) Finally, appellants insist that the evidence is not sufficient to support a conviction for second degree murder. After a careful review of the record, we have reached the conclusion that this contention must be sustained.

The record reflects that Mrs. Deaver was killed by a shot from a pistol during an altercation between her husband and the appellants. This unfortunate tragedy occurred on a cotton farm of which her husband, John Deaver, was manager, and where she was engaged in keeping records of weights of cotton picked by a large number of cotton-pickers, both white and black. At the time she had charge of a money box containing some $300 used to pay the cotton-pickers. She was seated at a table under a shade tree in the cotton field. About fifteen inches from her right hand, in the money box, rested an automatic pistol which she used to protect the money. She was very proficient in the use of a pistol. A controversy arose between appellants and Mr. Deaver about 15 or 20 feet from the table where Mrs. Deaver was seated. The controversy arose over the manner in which the cotton was being picked and appellants and Mr. Deaver became engaged in a fight. The evidence tends to show that when the controversy arose Moses Bone was

on a truck and Rome Bone and Mr. Deaver were on the ground about the same distance from where Mrs. Deaver sat at the table on which the pistol was lying.

John Deaver testified that Moses Bone had brought trashy cotton and poured it in the wagon; that he turned to his wife and told her to dock Rome and Moses three pounds for each of their sacks and that Rome Bone said, ''No white s— of a b— can dock me and get by with it,'' and then started for the table; that he then grabbed Rome Bone; that Moses Bone jumped on his back and then grabbed the cotton scales; that his wife ran around the table toward where they were fighting and shouted, ''Don't do that;'' that as she got within about three feet of him a shot was fired right over his head; that at the time the shot was fired, he was holding Rome Bone's leg and that the shot struck and killed his wife; that after Rome Bone had shot his wife he shoved the gun down into Deaver's face; that he pushed the gun away from his face and Rome Bone called to his brother ''to break the s— of a b—'s arm.''

Leslie Crosnoe testified that ''while he (Mr. Deaver) was knocked down on the ground Moses grabbed the scales and Rome got the gun and I thought they were going to kill Mr. Deaver and I ran in and tried to defend Mr. Deaver. As I struck one time at Rome, well, Moses hit me with the scales. I had the breast yoke of the wagon. . . . Moses knocked me out. I don't know what happened after that. Moses had the iron cotton scales. . . . I don't know how Mrs. Deaver was shot. She was shot after I was knocked out.''

Lester Conway, a boy 16 years of age, and Charles Conway, 14, testified that they were some 30 or 40 steps away when the altercation started and that when their attention was called to it, appellants and Mr. Deaver were fighting with their fists and that they first saw the gun after Mrs. Deaver had been shot.

Elizabeth Reddix, witness for appellants, testified that she was picking cotton for Mr. Deaver at the time the difficulty occurred and heard Mr. Deaver cursing and abusing appellants, and that neither of appellants cursed

Mr. Deaver. She heard Mr. Deaver cursing and saying, "I ought to kill a bunch of damn negroes."

Joe Wirges testified that he is a reporter for the *Arkansas Gazette;* that after the difficulty he went to St. Vincent's Infirmary to get the details from Mr. John Deaver. "Q. I will ask you if he stated to you at that time and place, 'I ran over to the desk and picked up my pistol and was knocked down by one of the brothers. They took the gun from me, and during the struggle the gun discharged.' Did he make that statement to you? A. Yes, sir."

Julia Wiggins, on behalf of appellants, testified that she was present at the time of the altercation and that the trouble started between appellants and Mr. Deaver with a "big argument." When the fight started they were on the ground. She did not see any gun in Rome's hand at that time. "They were just fighting; they were all tied up. . . . They all surrounded one another. They were fighting." Mr. Deaver had been down on his knees, but was up and they were all standing up. She heard Mrs. Deaver say, "John, don't—do something." "She (Mrs. Deaver) called his name. All at once that gun went off. Went like it went in a barrel. They were so thick around there, didn't even have a sound hardly. The people out in the field didn't quit picking cotton because they didn't hear it." She never saw the gun during the fight.

Geraldine Simms testified that she was a short distance from the scene of the fighting and heard the fatal shot fired. That Mr. Deaver went to the truck and Rome went to him and asked him "was that his gun," and Mr. Deaver said, "Yes." "Q. Anything else said between them? A. He told Mr. Deaver he fired his own gun. Q. That who fired his own gun? A. Rome told Mr. Deaver he fired his own gun and shot his own wife. Q. What did Mr. Deaver say? A. Deaver said, 'Yes,' and got in his truck and went out of the field." Appellants left the field taking the gun with them, and turned it over to the officers.

George Walls testified that he was present at the time of the altercation; that Moses Bone was on the

truck emptying the sack and Rome was standing on the ground. Mr. Deaver was on the back of the truck when the trouble first arose about unclean cotton. Mr. Deaver complained about the cotton and Moses said they would quit and asked that they be given their money. Mr. Deaver said, "I don't want no smart talk, shut up your mouth." Mr. Deaver went back to the little table where his wife was sitting. "Q. Do you know what he went to the table for? A. I didn't until he turned around back facing me. Q. How did you know then, George? A. I saw a gun. Q. He walked to the table and when he turned around facing you, you saw the gun? A. Yes, sir, it was in his hand." When Mr. Deaver came back with the gun, pointed on the truck, Rome said, "Cap, don't do that, we will go home." Mr. Deaver turned around toward Rome, pointed his hand at Rome, and Moses jumped from the back of the truck. He (George Walls) did not understand what Mr. Deaver said to Rome. When he turned the gun on Rome, Moses jumped off on him. All three began scuffling, tussling, and Mr. Deaver had hold of the gun. He stayed on the truck and was looking at them when the gun fired. Mrs. Deaver had done nothing except she got up from the table. "She went around toward the truck and during the scuffle the gun discharged while Mr. Deaver had hold of the handle."

George Walls further testified that Rome and Crosnoe were fighting at each other, one with a pair of scales and one with a breast yoke. That was before the shot was fired. Moses never at any time turned loose of Mr. Deaver after he got his arm around him and got hold of his hand, until after the gun was discharged. Rome did not enter into the fight until after the gun discharged, but was fighting with Crosnoe. After the gun was discharged, Crosnoe got his mule and left and came back later. Mr. Deaver got in the truck and went away. "Q. After the scuffle was over, Rome had the pistol? A. Moses and Mr. Deaver were still tussling after the shot was fired and Mr. Deaver said, 'Quit, my wife is shot, let me get her to a doctor and I will pay you,' and the boys begged Mr. Deaver to turn the gun loose." Rome didn't have anything to do with the scuffle with Mr.

Deaver until after the shot was fired, then he caught hold of Mr. Deaver and told him to turn loose the gun and their hands were linked up together and appellants were begging Mr. Deaver to turn the gun loose.

Appellants testified in their own behalf to the effect that they engaged in the altercation with Mr. Deaver solely to protect their own lives and only after he had cursed and abused them and attacked them with a pistol in his hand; that they had no ill-will or ill-feeling toward either Mrs. Deaver or Mr. Deaver; that the pistol, which killed Mrs. Deaver, was fired while they were wrestling with Mr. Deaver for possession of the pistol and that the pistol was in Mr. Deaver's hand at the time. They were not acquainted with either Mrs. Deaver or Mr. Deaver until they began work picking cotton on the day before the encounter in question.

There is nothing in this record to indicate that these two negroes were quarrelsome or that they were not peaceable and industrious. After the trouble, appellants voluntarily went to a telephone and called the Little Rock police and surrendered.

There is other evidence in the record which we deem it unnecessary to set out here. Suffice it to say that after a careful review of the record, we have reached the conclusion that when the evidence on the part of the state is viewed in the most favorable light to the state, the highest degree of homicide which it can support is voluntary manslaughter.

Manslaughter is defined by § 2980 of Pope's Digest as follows: "Manslaughter is the unlawful killing of a human being, without malice, express or implied, and without deliberation."

Voluntary manslaughter is defined by § 2981 of Pope's Digest as follows: "Manslaughter must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible."

In discussing the insufficiency of the evidence to support a charge of second degree murder, this court in the recent case of *McClendon* v. *State*, 197 Ark. 1135, 126

S. W. 2d 928, said: ''There is no evidence in the record tending to show any enmity between appellant and deceased prior to the difficulty resulting in the injury to deceased. All the evidence is to the effect that appellant and deceased were on good terms. . . .

''According to the testimony of the state, the difficulty occurred when Exa threw a pan of bread at deceased and ordered them out of the house; . . .

''There is no question that a sudden fight occurred between the parties a few minutes after Williams and Reed entered the kitchen. The fight was carried on with most anything they could get their hands on. . . .

''We do not think it has been shown beyond a reasonable doubt that the killing was the result of malice, and certainly it does not show beyond a reasonable doubt that it was the result of deliberation and premeditation on the part of appellant. . . .

''We think that when the evidence on the part of the state is viewed in the most favorable light to the state, the highest degree of homicide which it can possibly support is voluntary manslaughter.''

Accordingly the judgments are reduced to seven years in each case, and as thus modified they are affirmed.