SCAIFE *v*. STATE.

4364                                          182 S. W. 2d 679

Opinion delivered October 2, 1944.

*Guy E. Williams,* Attorney General, and *Oscar E. Ellis,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. Hal Scaife, 25 years of age, killed his wife and her mother by cutting and stabbing them with a hunting knife. When tried on a charge of having murdered Mrs. Scaife his plea of self-defense was partially disregarded by the jury when it returned a verdict of murder in the second degree. From the Court's judgment of ten years in the penitentiary the defendant has appealed.

Assignments 1, 2, 3, and 4 relate to evidence; 5 and 6 question instructions given and refused, while 7 complains of the Court's refusal to grant a new trial on the ground of newly-discovered evidence.

After receiving limited training at Great Lakes Naval Station, Scaife was assigned to the Naval Training Station at Millington, Tennessee, near Memphis. His wife remained at Marvell with her mother, Mrs. Susie Davis. Peggy Carey, whose chastity is assailed, moved into the home with appellant's wife and mother-in-law. This arrangement was contrary to Scaife's wishes, as expressed to his wife. It is alleged that Peggy entertained men at appellant's home. Relations between husband and wife grew strained—so much so, appellant testified, that

he counseled with a navy chaplain who advised that Mrs. Scaife and their two children be brought to Memphis. The churchman agreed to assist in finding an apartment as near Millington as practicable.

Appellant testified that, with this solution of marital difficulties in view, he procured leave and went to Marvell. to present the proposal to Mrs. Scaife. She declined to discuss the matter, or to have anything to do with him. Mrs. Scaife refused to prepare appellant's supper, and also rejected his invitation to attend a picture show. He asserts that she left before he had completed his meal and went alone to the show, although he followed and occupied an adjoining seat. Instead of showing interest in her husband, Mrs. Scaife carried on conversations "with a man immediately across the aisle from her," and finally left the theater unaccompanied.

Appellant, following, returned home for the purpose (as he expressed it) of completing plans to take the family to Memphis. When he entered the building Mrs. Scaife was seated in a chair in the living room with the baby on her lap. Appellant says that as he stood facing his wife, Mrs. Davis entered from an adjoining room armed with a single-barrel bolt-action shotgun. This she handed to Mrs. Scaife. When appellant attempted to disarm Mrs. Scaife he was assailed by Mrs. Davis, who "jumped astride my back," pinning appellant's arms to his side. It is insisted that the three-way conflict progressed from room to room, with Mrs. Scaife holding on to the gunstock, appellant clinging to the barrel, and Mrs. Davis maintaining her position astride the distraught appellant whose arms were firmly held to his side by the force of the mother-in-law's advantageous position. As the scene shifted the contestants entered the northeast room. There, in the drawer of a small chest, appellant had left a hunting knife. When opportunity afforded, appellant released his hold on the gun barrel, and (we quote verbatim) ". . . reached down and opened the top of the chest, securing his knife with which he intended to inflict upon his mother-in-law—who was still astride his back and still pinning his arms to his side—just enough

pain to cause her to relax, with the intention of securing the gun from his wife. It seems that when this was done the fight was renewed with much vigor by these two women, and in the scuffle both women were cut and received wounds from which they later died."[1]

In spite of fatal injuries, the women fled to the adjoining home of Mrs. Daisy Middleton, where they collapsed. Mrs. Middleton had previously heard a disturbance "like someone running back and forth through the rooms." She had also heard screaming. Mrs. Davis exclaimed, "He is after us." Mrs. Scaife's comment was, "He is killing us." And again, "He will kill my baby." Mrs. Scaife then collapsed, but was not unconscious.

Mrs. Davis died shortly after reaching the Middleton home. There is testimony that Mrs. Scaife kept "pulling at her side where her intestines were coming out"; that she immediately asked for a doctor, who came within ten or fifteen minutes, and that Mrs. Davis was dead when the doctor arrived, or died soon thereafter.

At the Middleton home appellant talked with Dr. Hosey as the latter administered to Mrs. Scaife. While the physician was attempting to relieve Mrs. Scaife with morphine hypodermically injected, appellant began asking his dying wife if she intended to give him a divorce. She replied, "Make him leave me alone; I don't feel well." The doctor then told the injured woman she was going to die, and remarked to appellant, "You will get your divorce in a few minutes." Appellant got down on his knees and attempted to kiss his wife, or caress her cheeks, while she protested. When appellant asked his wife if she still wanted a divorce she said, "Hal, you are the one who wanted the divorce."

Mrs. Scaife was placed in an ambulance to be sent to a Helena hospital, but died before reaching the city.

Objection is that testimony was admitted relating to statements by the injured women before appellant reached the Middleton house, or while he was not pres-

---

[1] Quotations are from appellant's abstract of testimony and preliminary statements.

668

ent. There is, however, substantial evidence that Dr. Hosey, who lived only eight or ten blocks from the scene, responded to calls within ten or fifteen minutes, and that appellant's victims were dying, and must have known how seriously they were wounded. Their declarations and actions were in a sense spontaneous, made in consequence of emotional impulses flowing directly from the transaction which resulted so quickly in death, and without the intervention of any period of repose during which the mind could be presumed to have formulated a self-serving purpose at variance with the facts.

In *Carr* v. *State*, 43 Ark. 99, it was said that circumstances and declarations contemporaneous with the main fact under consideration, or so nearly related to it as to illustrate its character and the state of mind, sentiment

and disposition of the actors, are parts of the *res gestae*. They are regarded as verbal facts indicating a present purpose and intention, and therefore admitted in proof "as any other material facts." It was then said, in respect of declarations, etc. that ". . . they need not be strictly coincident as to time, if they are generated by an excited feeling which extends without break or let down from the moment of the event they illustrate; but they must stand in immediate causal relation to the act and become part, either of the action immediately preceding it, or of action which it immediately precedes."

It was said in *Walker* v. *State*, 138 Ark. 517, 212 S. W. 319, that "*Res gestae* are the acts talking for themselves; not what people say when talking about the act, and the words must stand in immediate causal relation to the act, unbroken by interposition of voluntary, individual wariness seeking to manufacture evidence for itself."

Wharton, Criminal Evidence, 11th Ed., p. 769, summarizes the rule in this way: "Necessarily, what is part of the *res gestae* depends on the facts peculiar to each case, since the *res gestae* embraces not only the actual facts of the transaction and the circumstances surrounding it, but also the matters immediately antecedent to

and having a direct causal connection with it, as well as acts immediately following it and so closely connected with it as to form in reality a part of the occurrence. The rule is not so rigid nor well defined as could demand absolute accuracy in its construction either by the trial or the reviewing courts.''

We think the matters complained of in appellant's assignments 1, 2, 3, and 4, do not transgress the rule of admissibility; nor was the verdict contrary to the evidence. The fact that appellant's domestic relations were strained could in no sense justify him in killing the two women; hence the Court's action in rejecting Chaplain Novack as a witness regarding things said and done at Millington (in respect of which Mrs. Scaife had no physical connection) was not error. The same rule is applicable to letters ostensibly written by Mrs. Scaife to a man other than her husband with whom she was alleged to have been in love, and likewise applies to a letter found in Mrs. Scaife's effects allegedly written by her to the same man, but unmailed. Appellant does not contend that he killed his wife because of her relations with other men. The entire defense is one of justification based upon fear for his own life.

It is contended, however, that the State sought to show that appellant was displeased because Mrs. Scaife would not agree to a divorce; hence premeditation.

In refusing to allow two of the letters to be considered generally, the Court gave the following instruction:

''The letters introduced by the defendant as having been written by the deceased, Jennie Ruth Scaife, . . . may be considered for one purpose only, and that is for the purpose of shedding such light as they do on the question of whether or not the defendant was acting in his necessary self-defense at the time of the killing, as the law of self-defense has been defined to you in these instructions.''

As a matter of fact, the letters were of no evidential value affecting appellant's self-defense plea. But even

so, he was not injured by the partial consideration permitted by the court.

The sixth assignment is that it was error to refuse the defendant's requested Instruction No. 9: ''Although you may find from the evidence that in cutting the deceased the defendant did not exercise due caution, yet if you should find that he cut the deceased while under mental fright or excitement, he would only be guilty of manslaughter.''

An instruction given was that to constitute murder in the second degree it is necessary to show that the killing was done with malice aforethought. The jury was further told that in determining whether the defendant acted in necessary self-defense, ''you are to consider his surroundings and circumstances at the time, and [decide whether] they were such as to create in his mind an honest belief that he was in danger of losing his life or receiving great bodily injury. . . . If you believe from the evidence that such was the case, and that the defendant cut the deceased while acting under such belief, and that he acted with due caution and circumspection and without negligence, then it would be your duty to acquit.''

While this instruction went to the question of complete justification as distinguished from murder in the second degree, very definite expressions throughout the Court's directions were such as to impress upon jurors the fact that before finding the defendant guilty in any degree there must have been conscious volition. For instance, Instruction No. 4, given at appellant's request, told the jury that ''. . . before you would be warranted in convicting the defendant of murder in the second degree . . . the State would be required to prove to your satisfaction, beyond a reasonable doubt, that at the time the defendant cut the deceased he bore malice aforethought against her.''

Consummation of a malicious transaction is inconsistent with that degree of great mental strain and excitement which serve to dethrone reason.

It is finally urged that the Court erred in refusing to grant a retrial because of newly-discovered evidence.

The stabbing and cutting occurred Friday evening. A day later Roy Scaife, appellant's brother, claims to have found a green 20-gauge shotgun shell in the yard. Appellant had testified that after disarming his wife and mother-in-law through use of a hunting knife, he unbreached the gun and ejected a loaded shell. It is contended that Roy Scaife gave the shell to Deputy Sheriff Hickey, who testified at Hal Scaife's trial that he did not know anything about a shotgun shell. The Middletons, husband and wife (to whose home the injured women fled) would testify that such a shell was left at their home.

Appellant thinks he was prejudiced because the jury might have thought that the gun story was fictitious, invented by the defendant to serve his purpose.

The record discloses that Hickey, when called by the State as a rebuttal witness, testified that in response to a request by the deputy prosecuting attorney he went to the Scaife home the afternoon following the tragedies. His attention was called to testimony by Roy Scaife that he (Roy) pointed to a shotgun shell in the yard, and that Hickey picked it up. The officer denied picking up the shell. He had previously visited the premises and found the shotgun. It had fresh blood on the stock. Hal Scaife told this witness he unloaded the gun, but didn't remember what was done with the shell. The officer then testified that he did not find a shell. It appears that a shell similar to that described by Roy Scaife was found on the Middleton dresser. No one seems to know where it came from.

The affidavits do not entitle appellant to a new trial. Existence of the gun is not denied. It was described by the state witness, Hickey. If the weapon featured in the tragedies as appellant contends, he did not, at the time, speculate upon whether it was loaded or unloaded. It will be presumed that he thought it was loaded—that is, if the two women actually used the gun

as Scaife claims. The defendant was not prejudiced by reason of the discovery or non-discovery of a shell.

Affirmed.