Jones *v.* City of Forrest City

5119                                    388 S. W. 2d 386

Opinion Delivered March 29, 1965.

*George Howard, Jr.,* for appellant.

*Bruce Bennett,* Atty. Gen., *By : Russell J. Wools,* Asst. Atty. Gen., for appellee.

Carleton Harris, Chief Justice. Jessie A. Jones was charged by the city of Forrest City with. Driving While Intoxicated, Resisting Arrest, and Assaulting an Officer. After being convicted on all counts in the Munipical Court, Jones appealed to the Circuit Court, where he was tried before a jury. The cases were consolidated for trial, and, after hearing the evidence, the jury brought in a verdict of guilty, as follows:

Driving while intoxicated—fine of $250.00, 30 days in the county jail, and 1 year's revocation of driver's license;

Resisting arrest—$500.00 fine, and 90 days in the county jail;

Assaulting an officer—$500.00 fine, and 90 days in the county jail.

Judgment was entered in accordance with the verdict, and it was ordered that the sentences run consecutively. From such judgment comes this appeal.

It is first urged that the court erred in overruling appellant's motion to quash the petit jury panel, because of alleged racial discrimination in the selection of jurors in St. Francis County. A large portion of appellant's brief deals with this contention, but since the case must be reversed on other grounds, we see no reason to discuss this particular point.

We think the court committed error in permitting the introduction of evidence concerning a sobriety test administered to appellant. The evidence reflects that Jones was arrested by officers Dave Parkham and Jack Jones, and taken to the city jail. There, according to the officers, he voluntarily agreed to take a sobriety test. This particular test related to ascertaining the alcoholic content in the urine and blood. Officer Jones stated that he took appellant to the bathroom, and handed him a bottle for the purpose of obtaining a urine specimen; that he (the officer) then labeled the bottle, by placing the name, ''Jessie Jones,'' on it, and left it in the bathroom. Officer Jones testified that the bottle was approximately of one-half pint size, ''the type they use at the hospital,'' and the witness stated that no other specimens were in the room when he left. Subsequently, Robert C. Smith, Jr., a laboratory and X-ray technician at Crawley-Cogburn Clinic, was called by someone, and Smith went to the Police Station, picked up a bottle containing a specimen in the bathroom, and there after ran a test which showed 4.4 milligrams of alcohol per CC. According to the explanation given by Smith, the analysis reflected that Jones was drunk and disorderly. [1] Smith's testimony was objected to by appel-

[1] From the testimony: "Mr. Smith, according to your learning and your teaching, tell the jury what the different stages are and how they are corolated with alcohol in the urine?" A. "At the lower readings, 1.5, a man's reflexes are supposed to be slowed enough that it will affect his driving, in other words, he is just where he thinks he can have a good time, he is feeling pretty good; from 2.5 to 3.5 he is pretty well what we

lant, but the objection was overruled. We are of the opinion that this evidence was erroneously admitted, first, because the prosecution is required to establish all necessary links in the chain of evidence, which would clearly identify the urine analyzed as coming from the body of the accused. In *State* v. *Reenstierna* (New Hamp.), 140 A. 2d 572, Chief Justice Kenison, speaking for the court said:

"* * * The State is required to establish the essential links in the chain of evidence relied on to identify the blood analyzed as being the blood taken from the accused. * * *

"In this case the blood sample taken from the defendant has not been identified with and traced to the analysis made by the State Department of Health. However likely it may be that they are one and the same, the State has failed to prove it."

In *People* v. *Lesinski,* 171 NYS 2d 339, two members of the Buffalo Police Department arrested the defendant about 11:15 P.M. A urine sample was taken about 11:40 P.M., and a salt solution was placed in the bottle which the officer witness placed in his pocket. The witness then took the bottle to his home, and placed it beneath a vanity dresser in his bedroom, and next morning picked up the bottle and delivered it to a police chemist. The testimony reflected that the witness' wife, mother, and father-in-law lived with him at the home, where the bottle had been kept all night. The case was reversed on this point and another, and the court said:

"Identify and unchanged condition must be first established before a specimen may be allowed in evidence together with the chemist's testimony or his report. Where material evidence for a conviction of driving while intoxicated is the alcoholic content of a blood or urine specimen, it is essential to show the chain of possession of the sample and the unchanged condition of the container from the time it is taken from the defendant until it is delivered to the chemist."

---

call or consider drunk." Q. "What you call drunk?" A. "Yes, sir." Q. "Over 3.5 what is his condition?" A. "The literature says he is drunk and disorderly and at 5 or 6, he is out."

In *Novak* v. *District of Columbia,* 160 F. 2d 588, the United States Court of Appeals for the District of Columbia reversed the trial court judgment, holding that the evidence of a chemist, as to an analysis of a sample of urine taken from a defendant, was inadmissible. The court stated:

"At the trial the officer testified that after he obtained the sample he labeled the flask containing it with appellant's name, the time and place of taking it; that he wrote his own initials on the label and the next day turned the specimen over to the District Health Department laboratories.

· "The court then accepted in evidence, over appellant's objections, laboratory records of the Health Department of an analysis made by a chemist formerly employed by the department, and the testimony of another Health Department chemist concerning his later analysis, both made of a sample of urine taken from a bottle labeled with appellant's name. The chemist, at the time of his testimony, had beside him a small bottle, labeled, and containing a liquid which appeared to be urine. His testimony was that he made his analysis from a specimen which he withdrew from the bottle which he had beside him. The bottle was never identified or offered in evidence. According to the laboratory records, both analyses showed an alcoholic content of .24 of 1 per cent.

"The District of Columbia then called an expert witness who testified that in his opinion, a chemical analysis of the sample of urine showing .24 of 1 per cent alcohol indicated that the defendant was under the influence of intoxicating beverage at the time of his arrest.

"It is our holding that the laboratory records and the chemist's testimony respecting the analysis were not properly admissible in evidence because the District of Columbia failed sufficiently to identify the sample from which the analyses were made as being that sample taken from appellant. The police officer who secured the sample was present in court and testified to the manner in which he labeled the flask containing appellant's urine and how he

215

placed his initials on the label. The chemist, when he testi-
fied, had beside him the bottle of urine on which he had
made an analysis. But no effort was made to hand to the
police officer, who was present in court, the bottle and
chemist had used to see if he could identify it as the bottle
he had labeled and initialed. There is missing a necessary
link in the chain of identification. The judgment is re-
versed and the case remanded * * *''

In the instant case, let us summarize the evidence as to
whether it firmly establishes that the analysis was made
from the specimen taken from appellant. Officer Jones
testified that the specimen was taken in the bathroom of
the jail, and that he placed a cap on it, labeled it with the
name of the appellant, and left it in the room; that no other
specimens were in the room at the time. He then took ap-
pellant Jones back to the booking room. From the record
on cross-examination:

"Q. This specimen you took, I understand you left it in a
room?

A. Yes, sir.

Q. Who was in the room when you left it?

A. Nobody.

Q. Can you swear that the specimen this technician ex-
amined is the same specimen you allegedly took from the
defendant?

A. I say I left the specimen he gave in the little room with
the cap on it,

Q. You don't know whether the technician got that one
specific specimen or not?

A. I did not see him get that one, no.''

The record does not reflect who called Smith to come
to the jail. Officer Jones stated that "somebody" called
the chemist, and that he (Officer Jones) did not see Smith
when he arrived. In other words, the officer did not turn
the specimen over to Smith—or to anyone else. Smith testi-
fied that he was called to the Police Station in the "early

morning'' of July 19 to run a urinalysis; that he found a specimen with a name on it in the bathroom of the Police Station, and he made an analysis of the urine, and thereafter prepared his report. Smith never did say who called him to come down to the jail. From the evidence:

''Q. Mr. Smith, even though the bottle was labeled, you can't swear that that specimen was taken from this defendant, can you?

A. No.

Q. You don't know where it came from?

A. No.

Q. When you walked in there the bottle was sitting there?

A. Yes.

Q. That is all you know?

A. Yes.''

There is no testimony that the bottle was sealed, and, of course, there was no ''hand to hand'' or direct transmittal of the specimen to Smith. The bottle containing the specimen was apparently not retained, and, as shown by the quoted testimony, *no one* could definitely testify that the speciman examined by Smith was the specimen taken from appellant. [2] To use the language of Chief Justice Kenison, ''However likely it may be that they are one and the same, the state has failed to prove it.''

There is yet another reason why the evidence of Smith was inadmissible. Ark. Stat. Ann. § 75-1031.1 (Supp. 1963) deals with presumptions arising from the chemical analysis of a defendant's blood, urine, breath, or other bodily substance. Sub-section (C) provides, ''The chemical analysis referred to in the above paragraphs shall be made by a method approved by the Director of the Arkansas State Board of Health and/or the Director of Arkansas State Police.'' There is nothing in this record to show that the chemical analysis made by Smith was carried out by a

---

[2] If Officer Jones hand handed the specimen to the jailer, and he, in turn, had handed it to Smith, the chain would have been complete. To make the identification even more positive, on trial, Jones and the jailer, respectively, could have identified the bottle as the one handled by them.

method approved by either of these officials; according to his testimony, the test was run in conformity with tests given by the Forrest City Police Department, but there is likewise no evidence that this method had been approved by either of the state officials referred to. In its brief, the state asserts, "This is no error as the record does not reflect any testimony pertaining to this issue." We do not agree, for the burden was upon the state to establish that the test given had been approved by the Director of Health or the Director of Police. A similar requirement is prescribed in Nebraska, and in *Otte* v. *State,* 108 N.W. 2d 737, the Supreme Court held that, *inter alia,* it was error to admit testimony as to a blood analysis where there was no evidence that the analysis had been made according to a method approved by the Department of Health.

Appellant asserts that the court erred in giving an oral instruction, requested by the city, such instruction quoting pertinent parts of Section 75-1031.1. This was no error. In *Gentry* v. *State,* 201 Ark. 729, 147 S.W. 2d 1, we said:

"Appellant next complains because of the action of the trial court in giving Instruction No. 5 on behalf of the state. This instruction is a copy of § 3001 of Pope's Digest on the question of self-defense. This court has repeatedly ruled that instructions which follow the wording of the statute, and are applicable to the facts in the particular case, are always proper."

It is finally contended that the court erred in its refusal to give appellant's requested Instruction No. 5.

In its instruction, just referred to (75-1031.1), the court included Sub-section 3, as follows:

3. If there was at that time 0.15 percent or more by weight of alcohol in the defendant's blood, urine, breath or other bodily substance, it shall be presumed that the defendant was under the influence of intoxicating liquor."

Certainly, appellant was entitled to an instruction, which told the jury that the provision of Sub-section 3 was *only* a presumption, and was subject to being rebutted by proof on the part of the appellant. Appellant's tendered

instruction was very close to being correct, though it could have been better w o r d e d. In *St. Louis I.M. & S. Co.* v. *Waters,* 105 Ark. 619, this court disapproved the latter portion of an instruction defining a drunken condition. After removing that part of the instruction, the court approved the definition of drunkenness, as follows:

"For one to be in a drunken and intoxicated condition as defined by the law, he must be under the influence of intoxicating liquors to such an extent as to have loss of normal control of his bodily and mental faculties."

As previously stated, the cases were consolidated for trial, and the court told the jury that all charges were based on the same set of facts and circumstances. We are unable to say that the testimony of Smith did not influence the jury in their disposition of the charges of resisting arrest and assaulting an officer, particularly since Smith testified that the alcoholic content (determined from the urine analysis) reflected that the defendant was "drunk and *disorderly.*" In *Moore, et al* v. *State,* 227 Ark. 544, 299 S.W. 2d 838, we said:

"Where the effect of an erroneous instruction or ruling of the trial court might result in prejudice, the rule is that the judgment must be reversed on account of such ruling, unless it affirmatively appears that there was no prejudice."

That language is applicable in the case at Bar.

Accordingly, because of the errors heretofore set out, the judgment (s) is reversed, and the cause (s) remanded.