Alvin TURNER *v.* STATE of Arkansas

CR 75-2                                      527 S.W. 2d 580

Opinion delivered July 7, 1975
[Rehearing denied September 2, 1975.]

*George Howard Jr*, for appellant.

*Jim Guy Tucker*, Atty. Gen., by: *Gary Isebll*, Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellant was found guilty of assault with intent to kill C. E. Faris, a marshal of Strong. The incidents on which the charge was based occurred on July 22, 1973. The trial was on June 12, 1974. On the eve of trial, appellant, a negro, filed a motion to quash the jury panel, the names on the master jury list, and the "names now contained in the jury box," and to appoint a new jury commission. The first ground for the motion was that there had either been deliberate and systematic exclusion of negroes, systematic limitation of the number of negroes appointed as jury commissioners and called for jury duty or failure of the circuit judge and jury commissioners to acquaint themselves with negro citizens who are eligible for jury duty. Appellant also asserted in his motion that those who have been selected as jury commissioners and as jurors in the past are predominantly persons who are either self-employed, members of a profession or employed in a managerial capacity, or the wives of self-employed or professional people, resulting in economic discrimination in the jury selection process. Still another ground of the motion was that many persons who were called for jury duty have served previously or are members of the same family as persons who have previously served, in violation of due process and equal protection of the laws. Still another ground was alleged systematic exclusion of persons aged 18 to 21 years.

Of couse, appellant had the burden of proving the grounds alleged, or of facts which permit an inference of purposeful exclusion or limitation. *Fields* v. *State*, 255 Ark. 540, 502 S.W. 2d 480; *Mosby* v. *State*, 253 Ark. 904, 489 S.W. 2d 799; *Williams* v. *State*, 254 Ark. 799, 496 S.W. 2d 395. No

burden of refuting the alleged discrimination in jury selection rests upon the state until the defendant has established a prima facie case. *Williams* v. *State*, supra.

In attempting to discharge his burden appellant relied upon a stipulation that, according to the 1970 census, there were in Union County 22,639 white persons and 7,592 black persons over the age of 18 years, so that blacks constitute 26% of that segment of the population; testimony of the president of the local chapter of the NAACP, who was also a charter member of the Fair Voter's League, that he had participated in a concentrated campaign to get black people registered for voting purposes and that he estimated that 7,000 were registered in 1972, but that he had no records to indicate the number in either 1974 or any previous year; the testimony of the same witness that he visited the circuit courts in the county from time to time to observe the composition of juries and that he observed that certain elderly negroes were repeatedly called for jury duty; the testimony of an undertaker that he and one other black person were the only negroes on an eight-member jury commission which had served on February 9, 1971; testimony of a former president of the local chapter that certain black persons who had served as jury commissioners were 37, 39, 60 and 65 years of age; the testimony of a 55-year-old black resident of Strong that, while there were 600 black residents of that city out of a total population of 1,900, he only knew of one negro resident of Strong who had served as a juror and that he was between 35 and 40 years of age; the testimony of some of these witnesses that it was a matter of concern to him that he had never been called for jury service. There was no evidence as to the total number of registered voters in Union County.[1] Specific evidence as to the number of black registered voters was also lacking. There was no evidence of the percentage of either the population or registrants to vote who were under 21 years of age. A list of the current jury panel showed that none were 30 or under. It was stipulated that five (or 13.5%) of the 37-member jury panel were members of the black race, that one of these five was excused by the court because of his age and a hearing problem and another was eligible to be excused because of his age.

[1]The significance of the absence of such evidence was pointed out in *Rogers* v. *State*, 249 Ark. 117, 458 S.W. 2d 747.

Appellant somehow analyzed the current jury panel list to arrive at the conclusion that economic discrimination was shown because he finds 29 of 36 to be owners of business or occupying managerial status and the other 7 housewives, repairmen or unemployed. We are unable to tell how an electrician, a sales clerk, a saleslady, two teachers, a secretary, a retired grocer, an IBM processor, a "treater" for Lion Oil Company and others were classified by appellant.

The only evidence offered on behalf of the state other than the names of the jury commissioners serving in 1969, 1971, 1972 and 1973 was the record of the instructions given to the jury commissioners who selected the names put in the jury wheel from which the panel was drawn. In pertinent part, it read:

I wish to emphasize that you should select jurors from a fair cross section of this county, and you will not exclude or include any persons on account of race, color, religion, sex, national origin or economic status.

It must be noted that the state was considerably handicapped in this respect because the motion to quash the panel was not filed until the day the case was set for trial, in spite of the fact that the court's written calender contained instructions that all motions were to be filed seven days prior to the trial date.

The trial judge, in overruling the motion to quash, found that it appeared that jurors had been selected at random, and that the commissioners had attempted to get a cross-section of jurors throughout the county and to comply with the law.

Of couse, showing that the composition of the particular jury panel does not correspond to the racial makeup of the community, when the panel is drawn by chance from a jury wheel made up from a list of names taken from voter registration lists by jury commissioners, appointed according to statute[2] and properly instructed to select jurors from a

---

[2]This statute digested as Ark. Stat. Ann. § 39-201 et seq (Supp. 1973) appears to comply with federal constitutional standards. See *Pointer* v. *State*, 248 Ark. 710, 454 S.W. 2d 91; *Carter* v. *Greene County*, 396 U.S. 320, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970).

representative cross section of the county without discrimination as to race, does not in and of itself make a prima facie case of racial discrimination. *Murrah* v. *State*, 253 Ark. 432, 486 S.W. 2d 897. Quite a different situation from that shown in *Williams* v. *State*, 254 Ark. 799, 496 S.W. 2d 395, exists where individuals selected for jury duty are selected from lists **where races are not indicated, as is the case here.** See *Sheppard* v. *State*, 239 Ark. 785, 394 S.W. 2d 624. It is necessary that more be shown to establish a prima facie case than was shown in *Williams*, but the evidence here does not approach the showing of discrimination in Williams. The evidence here, given its highest probative value, does not even cast a suspicion, and that would not be sufficient. *Smith* v. *State*, 240 Ark. 726, 401 S.W. 2d 749. Certainly there is no evidence that the jury commissioners, after having been appointed, relied upon their personal acquaintance and did not seek to familiarize themselves with the qualifications of eligible jurors of all races and stations in life. We find that appellant failed to make a prima facie case of discrimination in the selection of the jury panel from which the jury before which he was tried was selected.

We know nothing about the extent of voter registration of the age group which appellant says was not represented on his jury panel, so it is questionable that they are a cognizable or identifiable group or class entitled to a group-based protection against exclusion. *United States* v. *Gast*, 457 F. 2d 141 (7 Cir., 1972), cert den., 406 U.S. 969, 92 S. Ct. 2426, 32 L. Ed. 2d 668 (1972). See also *United States* v. *Camara*, 451 F. 2d 1122 (1 Cir., 1971). Whether such a group exists within a community is a question of fact. *Hernandez* v. *Texas*, 347 U.S. 475, 74 S. Ct. 667, 98 L. Ed. 866 (1954). We do not find that the evidence in this case is sufficient to constitute a prima facie case placing the burden on the state to overcome it. It is not necessary that every jury contain representatives of every economic, religious, social, political and geographical group in a county. It is necessary that it be shown by one attacking the jury panel that there has been systematic and intentional exclusion of any of these groups before the panel can be quashed on that account. *Johnson* v. *State*, 252 Ark. 1113, 482 S.W. 2d 600; *Rogers* v. *State*, 249 Ark. 117, 458 S.W. 2d 747.

Appellant made no effort to show systematic exclusion of jurors on the basis of wealth or income and his analysis of the panel from which the jury was drawn in his case did not constitute prima facie evidence of economic discrimination. See *Kimble v. State,* 246 Ark. 407, 438 S.W. 2d 705. As a matter of fact, we have no idea of the composition of the population of Union County as to owners, managers, employees, unemployed, retired persons or common laborers. The composition of the particular panel cannot well be, in and of itself, proof of the exclusion of any particular group or class. *Fields v. State,* 255 Ark. 540, 502 S.W. 2d 480. No effort was made to show that the jury commissioners deliberately excluded names of persons to be placed in the jury wheel for 1974 on the basis of race, age or economic status. Even though the jury wheel system was adopted as a better means of assurance that jury panels would approach the ideal of a cross section of the community, it is highly unlikely that any panel drawn from the jury wheel could possibly achieve a perfect mirror of the community's percentages of population on the basis of race, sex, religious creed, educational status, economic standing, age grouping or any other basis on which the population may be broken down statistically. *Johnson v. State,* 252 Ark. 1113, 482 S.W. 2d 600. See also *Morris v. State,* 249 Ark. 1005, 462 S.W. wd 842.

It has been recognized that there must be room for some play in the joints of the jury selection process in order to accommodate the practical problems of judicial administration. See *Hamling v. United States,* 418 U.S. 81, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974). No defendant has a right to have jurors selected in a manner to assure him of a jury from his own ethnic group or occupation. *Pointer v. State,* 248 Ark. 710, 454 S.W. 2d 91.

When we view the evidence presented here in the light of Ark. Stat. Ann. § 39-201 et seq (Supp. 1973), the instructions given the jury commissioners and the presumption that public officials perform their duty properly, we cannot say that the trial court erred in holding that appellant had failed to meet his burden of proof.

We find no merit in appellant's contention that the cir-

cuit court erred in denying his request to require the state to disclose information prior to trial. The first item mentioned by him is "information and facts relative to prospective jurors," which he alleged to be in the possession of the prosecution. We do not deem this to be discoverable information under Ark. Stat. Ann. § 43-2011.1 - 43-2011.4 (Supp. 1974). Appellant made no specific allegation as to how this information would aid in his defense, except that it was essential to the intelligent exercise of his peremptory challenges. Neither this discovery statute nor the due process clause of the Fourteenth Amendment to the United States Constitution, both of which are relied upon by appellant, mandates discovery of the prosecuting attorney's work product in this respect. There is no indication that the appellant did not have all information available to the state about the master list or the identity of the names drawn for service as petit jurors at the session of court at which he was tried, except for such as might have been the result of the prosecuting attorney's own investigation, or that appellant or his attorney could not have obtained the same information by investigation.

Appellant also contends that the court should have granted his motion to require the prosecuting attorney to disclose whatever information he might have, or acquire in the exercise of diligence, pertaining to the criminal record of C. E. Faris, the officer he was charged with assaulting. Assuming that this information was discoverable, it seems clear that appellant was not prejudiced. Faris testified on cross-examination that he had been convicted of burglary and grand larceny in California. On redirect examination he said that his conviction had been reviewed some three years later under the penal code of California and the charges dismissed. He exhibited a document supporting his testimony. We find no abuse of discretion with regard to appellant's motion for disclosure.

Appellant also contends that the court erred in permitting state witnesses to testify concerning a blood alcohol test of a specimen taken from appellant.

His first attack upon this evidence is based upon the fact that he was not on trial upon a charge of driving while under

the influence of intoxicating liquors, saying that for this reason the testimony was irrelevant and immaterial. We do not agree. On a charge of assault, the condition of the accused as to intoxication is relevant as a part of the surrounding circumstances. *Spillman* v. *State*, 106 Tex. Cr. App. 455, 292 S.W. 891 (1927); *State* v. *Lance*, 149 N.C. 551, 63 S.E. 198 (1908); *State* v. *Rowell*, 75 S.C. 494, 56 S.E. 23 (1906). The condition of appellant in this respect is particularly pertinent in view of the testimony of the officer about what took place immediately preceding the shooting. See *Williams* v. *State*, 72 Ga. 180 (1883). It has long been the rule in this state that all that occurs at the time and place of a shooting which had any connection therewith is a part of the res gestae, being surrounding facts of the transaction explanatory of an act or showing a motive for acting. *Bone* v. *State*, 200 Ark. 592, 140 S.W. 2d 140. Circumstances so nearly related to the main fact under consideration as to illustrate its character and the state of mind, sentiment and disposition of the actor are parts of the res gestae, which embraces not only the actual facts of the transaction and the circumstances surrounding it, but also matters immediately antecedent to and having a direct causal connection with it, as well as acts immediately following it and so closely connected with it as to form in reality part of the occurrence. *Scaife* v. *State*, 207 Ark. 664, 182 S.W. 2d 679.

In considering the relevance of this evidence, it must also be remembered that appellant was asserting that he acted in self-defense. A critical issue was the *reasonableness* of his apprehension that he was in danger of losing his life or receiving great bodily injury. *Nelson* v. *State*, 249 Ark. 852, 462 S.W. 2d 452. In order to justify the assault, it must have appeared that the circumstances were such as to excite the fears of a reasonable person. *Smith* v. *State*, 172 Ark. 156, 287 S.W. 1026. Appellant was not entitled to act upon his belief that he was in danger, unless it was an honest belief, arrived at without fault or carelessness on his part, and he must have acted with due circumspection. If his belief was imputable to his negligence, he was not excused, no matter how honest his belief might have been. *Smith* v. *State*, 59 Ark. 132, 26 S.W. 712, 43 Ann. St. Rep. 20. Clearly, the inquiry as to Turner's state of intoxication was relevant for the jury's consideration of these issues.

Appellant's next objection was that the proper foundation had not been laid for introduction of the testimony because (1) the test was not made at the direction or request of a law enforcement officer, (2) the method employed for testing was not shown to have been approved by the Arkansas State Health Department, (3) the medical technologist was not shown to have had a permit issued by the State Department of Health, (4) it was not shown that appellant was advised that he could have an independent test made by a physician, nurse or medical technician, (5) it was not shown that the sample tested was in fact drawn from him, and (6) the state failed to show a continuous chain of custody of the blood specimen taken from him. He cites only Ark. Stat. Ann. § 75-1045 (Supp. 1973) and *Jones* v. *Forrest City*, 239 Ark. 211, 388 S.W. 2d 386 in support of his argument.

A short answer to this argument would be that the statute relied upon is limited in application by its own language to tests administered at the direction of a law enforcement officer having reasonable grounds to believe that the person whose blood is tested had been driving or in actual physical control of a motor vehicle upon the public highways. It simply prescribes the procedures to be followed in cases in which reliance is placed upon an accused motor vehicle operator's implied consent as the basis for making the test. But this is not such a case.

Dr. John W. Harper administered to Faris, Phelps and Turner in the emergency room at the Warner Brown Hospital in El Dorado. After Dr. Harper related his observations of the wounds of Faris and Phelps, he was asked on direct examination if he had treated Turner on the same occasion. When he answered in the affirmative, he was asked if he ascertained if Turner had received a gunshot wound. When this question was answered in the affirmative, he was asked if he had a responsibility to report a gunshot wound. When the doctor acknowledged the responsibility, he was asked whether in this particular case the matter was brought to him by the police, he answered, "That was right. They were present." He then explained his findings as to the gunshot wound of Turner and was asked if he ordered anything done in regard to blood tests. He answered, "Blood

alcohol was ordered." After objections were overruled, the following question was asked and answer given:

> Q. Dr. Harper, in regards to any type of blood test, was anything ordered by you in that regard?

> A. Blood alcohol was ordered, also a routine blood count and C.B.C. Anything that we routinely order was ordered also.

At no time did Dr. Harper suggest that the officers had either requested or directed that the test be made.

The sample was drawn by a registered nurse at the hospital upon Dr. Harper's request. She placed it in a vacuum tube on which she wrote Turner's name, the time, date, physician's name and what was to be done with the blood. She made out a requisition and placed the sample in a refrigerator located in the laboratory. She testified that this was a special refrigerator in which there was a designated place for blood samples, and that she followed the normal procedure in this regard. There was no intimation in her testimony that anyone other than Dr. Harper had anything to do with the taking of the sample. Wayne Tubbs, a medical technologist came into possession of and analyzed a blood sample in a tube accompanied by a requisition slip with Turner's name on it, the time and date taken and Mrs. Montgomery's name. Tubbs never testified that anything appeared on this particular requisition other than the information above related. After having stated that the name of a deputy sheriff or trooper had to be on the requisition, the following questions were asked and answers given.

> Q. So what you're saying is that you had a vial of blood that came into your possession that had Alvin Turner's name on it, the date the blood was drawn, and the person that drew the blood?

> A. Right.

> Q. Is that your testimony at this time?

A. Yes.

*****

Q. All right, you did come into possession of that tube in that condition?

A. Correct, sir. Yes.

Q. Did you then perform a test on it?

A. Yes.

We take this testimony to establish that the test was administered on the orders and directions of the attending physician and not of the police officers. Tubbs found an alcoholic content in excess of that which Dr. Harper had testified would indicate intoxication.

No objection was ever made on the basis of the violation of the physician-patient privilege. Since Dr. Harper did not act at the direction of, or by preearrangement with, any police officer, the taking of the sample did not constitute an unreasonable search and seizure. *Walker v. State*, 244 Ark. 1150, 429 S.W. 2d 121. Thus, the matter of appellant's implied consent is wholly immaterial, and the admissibility of the evidence of the testing of the blood sample was in no way dependent upon Ark. Stat. Ann. § 74-1045.

It is clear that no right to due process of law or privilege against self-incrimination was violated. *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966). Consequently, the "chain of custody" argument is the only remaining objection to be considered. This case is easily distinguished from *Jones v. Forrest City*, 239 Ark. 211, 388 S.W. 2d 386, upon which appellant relies. The urine specimen was taken there by a police officer, not a registered nurse acting upon the request of a treating physician and following normal hospital procedures. The specimen was left by the police officer in *Jones* in a bathroom at the jail, not in a special

refrigerator in accordance with normal hospital procedures. In *Jones,* the record did not reflect that the bottle containing the urine specimen was sealed. This case bears a much greater similarity to *Munn* v. *State,* 257 Ark. 1057, 521 S.W. 2d 535 (1975), where we held the chain of custody was adequately shown. There we recognized that possibility of access to a blood sample by others, where there was no evidence of tampering, would not render the result of a test inadmissible. This is in accord with the general rule and weight of authority in cases such as this, when there is little room for suspicion that the sample tested was not that of the defendant. See *Ritter* v. *Tennessee,* 3 Tenn. Cr. App. 372, 462 S.W. 2d 247 (1970); *Patterson* v. *State,* 224 Ga. 197, 160 S.E. 2d 815 (1968); *Interstate Life & Accident Insurance Co.* v. *Whitlock,* 112 Ga. App. 212, 144 S.E. 2d 532 (1965); *State* v. *Ross,* 130 Vt. 235, 290 A 2d 38 (1972); *State* v. *Lafountain,* 108 N.H. 219, 231 A 2d 635 (1967); *State* v. *Fornier,* 103 N.H. 152, 167 A 2d 56 (1960). This approach is totally in harmony with the rule followed by us in other cases where the chain of custody of samples tested has been attacked. See *Fight* v. *State,* 254 Ark. 927, 497 S.W. 2d 262. Although the trial court has some latitude of discretion in such matters, all that is required is that it be shown that there is a reasonable certainty that the specimen tested was that of the accused, at least when normal procedures are followed. We find no error here.

Appellant also asserts there was insufficient evidence to support the verdict in that: (1) since death did not follow the assault, intent to kill could not be presumed from the mere fact that a deadly weapon was used in the assault; and (2) the acts of appellant were in self-defense against an unwarranted assault by Faris; and (3) there was no proof that a bullet removed from Faris' shoulder was discharged from appellant's pistol.

When we view the evidence in the light most favorable to the state, as we must, we conclude that the evidence was sufficient. Appellant was stopped by Marshal Faris and Officer Charles Phelps because they observed him driving an automobile and crossing the yellow center line on the roadway. Officer Phelps knew that Turner's driver's license had been revoked or suspended. Faris asked Turner for his

driver's license and started writing a ticket for this offense when it was not presented, but noted that Turner mumbled his responses and detected the odor of alcohol about Turner. He then asked Turner how much he had to drink, and when he could not understand the response, advised Turner he would be taken to El Dorado for a test of alcohol on his breath. According to Faris, Turner said that he had to go get his wife and turned away, and when Faris put out his arm, apparently to stop Turner, Turner wheeled around and fired a weapon into Faris' face, striking him on the chin and shoulder. At the time, according to Faris, he and Turner were standing face to face. The physician who treated Faris found a superficial wound to his chin and removed a bullet from his shoulder. During the encounter, Faris, Phelps and Turner all suffered gunshot wounds and there were lacerations and contusions on the back of Turner's head.

Turner's testimony conflicts with that of the officers. Turner admitted on cross-examination that he had been convicted of failure to register a still, failure to post a distiller's bond, production of unlawful mash, driving while under the influence of intoxicating liquors (two or three times), drunkenness and disturbing the peace. It appears that the jury found that Turner's credibility was poor and gave credence to the testimony in the light most favorable to the state. Certainly an intent to kill could be inferred if Turner wheeled around so that he was standing face to face with Faris and fired his pistol so as to strike Faris on his chin. While it is true that intent to kill cannot be inferred from the mere use of a deadly weapon in an assault when death does not ensue, it is also true that the intent may be inferred from the manner in which the weapon is used and the nature, extent and location of any wounds inflicted. *Murray* v. *State*, 240 Ark. 34, 397 S.W. 2d 812.

The judgment is affirmed.

The Chief Justice and BYRD, J., dissent.

CARLETON HARRIS, Chief Justice, dissenting. I would reverse for the reason that I consider the trial court to have committed reversible error in permitting the testimony con-

cerning the blood alcohol test administered to appellant.

In my opinion, all blood tests which are the result of arrests occasioned by traffic violations must be administered as provided by Ark. Stat. Ann. § 75-1045 (Supp. 1973).[1]

[1]"(a) Any person who operates a motor vehicle upon the public highways of this State shall be deemed to have given consent, subject to the provisions of subsection (c) of this section, to a chemical test or tests of his blood, breath or urine for the purpose of determining the alcoholic content of his blood if arrested for any offense arising out of acts alleged to have been committed while the person was driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor. The test or tests shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person to have been driving or in actual physical control of a motor vehicle upon the public highways of this State while under the influence of intoxicating liquor. The law enforcement agency by which such officer is employed shall designate which of the aforesaid tests shall be administered and such agency shall be responsible for paying all expenses incurred in conducting such test. Provided, if the person tested requests that additional tests be made as authorized in paragraph (3) of subsection (c) of this section, the cost of such additional tests shall be borne by the person tested. Provided further if any person shall object to the taking of his blood for a test as authorized herein, the breath or urine of the person may be used to make the analysis. ***

"(c) (1) Chemical analyses of the person's blood, urine, breath or other bodily substance to be considered valid under the provisions of this section shall have been performed according to methods approved by the Arkansas State Board of Health.

(2) When a person shall submit to a blood test at the request of a law enforcement officer under the provisions of this Section, only a physician, a registered nurse or a registered laboratory technician or technologist may withdraw blood for the purpose of determining alcoholic content therein. This limitation shall not apply to the taking of breath or urine specimens. Provided, that no physician, registered nurse, or registered laboratory technician or technologist in this State who withdraws blood for the purpose of determining alcoholic content thereof at the request of a law enforcement officer under the provisions of this Section shall be held liable for violating any of the criminal laws of this State in connection therewith, nor shall any doctor, nurse or registered laboratory technician or technologist be held liable in tort for the withdrawal of such blood unless such persons are negligent in connection therewith, or unless the blood is taken over the objections of the suspect.

(3) The person tested may have a physician, or a qualified technician, registered nurse, or other qualified person of his own choice administer a complete (chemical) test or tests in addition to any administered at the

Turner was originally stopped by the officers while driving his vehicle because the officers observed him cross the center line. Upon being stopped, it developed that he did not have a driver's license and Officer Faris started writing a ticket on that basis. When the officer, according to his testimony, detected an odor of alcohol on Turner, he asked appellant how much he had had to drink, but could not understand Turner's response, and he then advised appellant that he (the officer) was going to take Turner to El Dorado for a breathalyzer test. The acts culminating in the charge here on appeal thereafter took place.

The statute is set out in the footnote and it will be observed that subsection (a) provides that the tests *"shall* be administered at the direction of a law enforcement officer" who has reason to believe that the person operating or in control of the vehicle is under the influence of intoxicating liquor. [My emphasis]. To me, this simply means that such tests *must* be administered at the direction of a law enforcement officer. The majority state that this was not done, but they also say that this statute, including the other provisions which are set out in the footnote, has no applicability unless the tests are administered at the direction of a police officer; in other words, since a police officer did not direct that the tests be administered, the statute does not apply. This, to me, is strange logic. Here, we have a statute which, in my view, commands that blood tests be administered at the direction of such officer, further setting out how the tests shall be administered, and by whom — but the majority say that since the primary requirement of that very statute (direction of a police officer) was not complied with, none of the provisions apply. In brief, this is the basis of our disagreement, for I contend the statute provides that *all* tests administered which arise out of a violation of motor vehicle laws must be administered under the direction of a police officer, and if this is not done, the evidence is not admissible. The majority cite the case of *Walker* v. *State*, 244 Ark. 1150, 429 S.W. 2d 121, but I consider

direction of a police officer. The law enforcement officer shall advise such person of this right. The refusal or failure of a law enforcement officer to advise such person of this right and to permit the person to obtain such test or tests when such person desires to have such test or tests shall preclude the admission of evidence relating to the test or tests (taken) at the direction of a law enforcement officer."

*Walker* as no authority whatsoever since that case was decided in 1968 and Act 106 of 1969 (§ 75-1045) was not even passed until the year following the *Walker* decision. Appellant objected that the proper foundation had not been laid for the introduction of the testimony because (1) the test was not made at the direction or request of a law enforcement officer, (2) the method employed for testing was not shown to have been approved by the Arkansas State Health Department, (3) the medical technologist was not shown to have had a permit issued by the State Department of Health, and (4) it was not shown that appellant was advised that he could have an independent test made by a physician, nurse or medical technician. It is apparent that I consider the objection to have been valid and it is my opinion that it should have been sustained. There is no dispute but that (2), (3) and (4) were not complied with.

While the above expresses my reason for dissenting, on the other hand, even taking the view of the majority, I still lean toward reversal for it is not entirely clear to me that Dr. Harper acted independently of the police in ordering the blood sample; of course, unless he acted independently, the taking of the sample constituted an unreasonable search and seizure. Though there is no direct statement that Dr. Harper acted at the direction of a police officer or deputy sheriff, it is clear that law enforcement officers were present when Turner was examined for injuries sustained, and I consider the testimony of Wayne Tubbs, a medical technologist, who testified that he received a sample of Tubbs' blood and made the test, pertinent to the issue. As to the testimony of Tubbs, the record reflects:

"Q. All right, do you happen to have your report with you on it? Is that a copy of your report?

A. This is a copy of the report that we gave *to the sheriff's department when they come and request a report as to our findings.* [My emphasis]

Q. The information that was obtained on that report came from your personally?

A. It came from the slip that — the slip of paper that we get with the sample of blood which . . .

Q. This slip of paper what you call a requisition slip?

A. Right.

Q. This is the thing that they tell what they want performed?

A. That's right.

Q. All right.

A. *The deputy sheriff has to request it for us to do it. Now their name or the trooper or the officer's name has to be on there for us to do it.* The report that you have is from that report."
[My emphasis]

Accordingly, it appears to me that the request for the blood test was made by the sheriff's department and thus, even under the concept of the majority, the provisions of § 75-1045 apply.

Following the testimony of Tubbs, counsel for appellant stated:

"We would object for an additional reason because he has told us law enforcement has come into play now and he's based on that request and the law provides that the law enforcement officer has a duty to notify him that he's entitled to have an independent check."

Counsel added that appellant was entitled to have another nurse or technician to make an analysis and not having been told that he had this right, the results of the test were inadmissible. This is in line with subsection (3) heretofore quoted, which clearly provides this right to one who is given the tests.

For the reasons herein set out, I would reverse the judgment and accordingly respectfully dissent.

BYRD, J., joins in this dissent.