## James WILLIAMS *v.* STATE of Arkansas

5742                         496 S.W. 2d 395

Opinion delivered July 2, 1973

*Walker, Kaplan & Mays, P. A.* and *Jack Green-berg* and *Norman J. Chackin,* New York, N.Y., for appellant.

*Ray Thornton,* Atty. Gen., by: *Henry Ginger,* Deputy Atty. Gen., for appellee.

J. Fred Jones, Justice. James Williams was charged with first degree murder committed in the perpetration of rape. He was found guilty as charged at a jury trial in the Ashley County Circuit Court and on December 9, 1964, he was sentenced to death by electrocution. His conviction and sentence were affirmed by this court on appeal, *Williams* v. *State,* 239 Ark. 1109, 396 S.W. 2d 834, and his execution date was set by the Governor for July 22, 1966. Execution was stayed by an order of this court entered on July 21, 1966, to permit Williams to seek post-conviction relief under our Criminal Proce-

dure Rule No. 1 promulgated and adopted because of the tremendous increase in habeas corpus petitions being filed in the state and federal courts by convicted felons *pro se* as authorized and permitted under United States Supreme Court decisions.[1]

Following the Rule No. 1 hearing in the Ashley County Circuit Court on November 9, 1967, the petition was denied by final order filed on May 25, 1971, and Williams now appeals from the trial court order denying relief on his petition to vacate the former judgment of conviction. In the intervening eight years since Williams was first tried and convicted, his death sentence was commuted to life imprisonment by executive clemency. The appellant now contends that the trial court erred in denying his petition for post-conviction relief for the reasons stated as follows:

> "Appellant's unrebutted evidence that Negroes were systematically excluded from or included in token numbers only upon the jury venires of Ashley County, Arkansas established a denial of his Fourteenth Amendment rights.
>
> Appellant's trial was conducted under such intimidating conditions and after such adverse, hostile and prejudicial publicity as to deny him a fundamentally fair hearing, and thus his rights under the due process clause of the Fourteenth Amendment were denied him."

The appellant's second assignment was presented, argued and considered on his first appeal and we do not reach it here because we find we must reverse his conviction under the first assignment.

The constitutional prohibition against exclusion of members of any race from jury service because of race has never been questioned in Arkansas. *Williams* v. *State,* 229 Ark. 1022, 322 S.W. 2d 86; *Dorsey* v. *State,* 219 Ark.

---

[1] *Fay* v. *Noia,* 372 U.S. 391; *Townsend* v. *Sain,* 372 U.S. 293 and *Sanders* v. *United States,* 373 U.S. 1. See also article "Accommodating State Criminal Procedure and Federal Post Conviction Review" by Daniel J. Meador in American Bar Association Journal, October, 1964, vol. 50, p. 1928.

101, 240 S.W. 2d 30; *Green* v. *State*, 222 Ark. 222, 258 S.W. 2d 56; *Maxwell* v. *State*, 217 Ark. 691, 232 S.W. 2d 982; *Bailey* v. *State*, 227 Ark. 889, 302 S.W. 2d 796. In *Williams* and *Dorsey* we pointed out that the burden of showing facts which permit an inference of purposeful limitation for jury service because of race is on the defendant. It only follows that when a *prima facie* case of purposeful limitation is proven by the defendant, the burden then shifts to the state to prove otherwise. The state offered no evidence whatever in the case at bar, so the question before us is whether the appellant made out a prima facie case of purposeful exclusion of Negroes because of their race from the jury panel in this case.

There can be no question that this court, as well as the trial courts of this state, is bound by the decisions of the United States Supreme Court concerning rights and prohibitions under the provisions of the United States Constitution and, there is no question that the United States Supreme Court has spoken clearly, and more than once, on the question of racial discrimination in the selection of juries in criminal cases. We shall not attempt to cite all the Supreme Court decisions bearing on the subject nor shall we quote extensively from any of them, but the substance of these decisions is simply this: Where individuals are selected for jury service from tax lists, or from any source, where separate race is indicated, and where there is a large percentage of Negroes as compared with whites who are presumed to have the legal qualifications to serve as jurors; a prima facie case of racial discrimination is presented when jury commissioners select those to serve on juries only from among the individuals with whom they are acquainted and such procedure results in a small percentage of Negroes as compared with whites being selected for jury service. Such prima facie evidence may, of course, be rebutted by evidence that the comparatively small percentage of Negroes selected was not because of their race. The burden of presenting such evidence, however, rests on the state.

We need only mention in some detail two United States Supreme Court decisions from which the above rule is extracted. They are *Cassell* v. *Texas,* 339 U.S.

282, 70 S.Ct. 629, 94 L.Ed. 839; *Whitus* v. *Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed. 2d 599. These decisions have been followed by the Federal Courts of Appeals in many cases but we deem it unnecessary to comment on more than two or three of them including the case of *Bailey* v. *Henslee,* 287 F. 2d 936, which arose from this state.

The background for the decision in *Cassell* v. *Texas, supra,* arose in two prior cases, *Hill* v. *Texas,* 316 U.S. 400 and *Akins* v. *Texas,* 325 U.S. 398. In *Hill* no Negro had ever been selected for grand jury service in Dallas County, Texas, and the jury commissioners testified that they had summoned, for service on the grand jury which returned the indictment, members of the white race with whom they were acquainted and whom they knew to be qualified to serve. They said that they considered Negroes for selection but did not personally know a qualified Negro they thought would make a good grand juror. The Supreme Court held that the petitioner had made a prima facie case of racial discrimination in the selection of jurors and after referring to *Pierre* v. *Louisiana,* 306 U.S. 354, said:

"We thought, as we think here, that had there been evidence obtainable to contradict the inference to be drawn from this testimony, the State would not have refrained from introducing it, and that the evidence which was introduced sufficiently showed that there were colored citizens of the county qualified and available for service on the grand jury."

The *Hill* case was decided on June 1, 1942, and on June 4, 1945, the United States Supreme Court handed down the opinion in *Akins* v. *Texas, supra,* wherein the Texas State Court, in attempting to comply with the decision in *Hill,* selected one Negro on a 16 man grand jury panel from which 12 were chosen as a grand jury. In upholding the jury selection in *Akins,* the Supreme Court said:

"Purposeful discrimination is not sustained by a showing that on a single grand jury the number of members of one race is less than that race's pro-

portion of the eligible individuals. . . . Defendants under our criminal statutes are not entitled to demand representatives of their racial inheritance upon juries before whom they are tried. But such defendants are entitled to require that those who are trusted with jury selection shall not pursue a course of conduct which results in discrimination 'in the selection of jurors on racial grounds.' *Hill* v. *Texas, supra,* 404. Our directions that indictments by quashed when Negroes, although numerous in the community, were excluded from grand jury lists have been based on the theory that their continual exclusion indicated discrimination and not on the theory that racial groups must be recognized. *Norris* v. *Alabama, supra; Hill* v. *Texas, supra; Smith* v. *Texas, supra.* The mere fact of inequality in the number selected does not in itself show discrimination. A purpose to discrimination must be present which may be proven by systematic exclusion of eligible jurymen of the prescribed race or by unequal application of the law to such an extent as to show intentional discrimination. Cf. *Snowden* v. *Hughes,* 321 U.S. 1, 8."

The opinion in *Cassell* v. *Texas, supra,* was rendered on April 24, 1950. In that case an all white grand jury panel had been selected and the Negro population of Dallas County was approximately 15.5%. There were 21 grand juries during the period between the *Hill* decision and the *Cassell* indictment, and of the 252 names on the panels, 17, or 6.7%, were Negro. The payment of a poll tax was a qualification for jury service and 6.5% of the poll tax payers were Negro. It was determined by the court that as a matter of proportional percentages, a prima facie showing of racial discrimination had not been shown. But in *Cassell,* the petitioner also contended that subsequent to the decision in *Hill,* the grand jury commissioners, for 21 consecutive lists, had consistently limited Negroes selected for grand jury service to not more than one on each grand jury, on the theory that such limitation was permissible under *Akins* provided the limitation should be approximately proportional to the number of Negroes eligible for grand jury service. In *Cassell* the Supreme Court said:

"An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race.

Our holding that there was discrimination in the selection of grand jurors in this case, however, is based on another ground. In explaining the fact that no Negroes appeared on this grand-jury list, the commissioners said that they knew none available who qualified; at the same time they said they chose jurymen only from those people with whom they were personally acquainted. It may be assumed that in ordinary activities in Dallas County, acquaintanceship between the races is not on a sufficiently familiar basis to give citizens eligible for appointment as jury commissioners an opportunity to know the qualifications for grand-jury service of many members of another race. An individual's qualifications for grand-jury service, however, are not hard to ascertain, *and with no evidence to the contrary,* we must assume that a large proportion of the Negroes of Dallas County met the statutory requirements for jury service. When the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color. They did not do so here, and the result has been racial discrimination. We repeat the recent statement of Chief Justice Stone in *Hill* v. *Texas,* 316 U.S. 400, 404:

'Discrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case, discrimination necessarily results where there are qualified negroes available for jury service. With the large number of colored male residents of the county who are literate, *and in the absence of any countervailing testimony,* there is no room for inference that there are not among them householders of good moral character, who can read and write, qualified and available for grand jury service.'

The existence of the kind of discrimination described in the *Hill* case does not depend upon systematic exclusion continuing over a long period and practiced by a succession of jury commissioners. Since the issue must be whether there has been discrimination in the selection of the jury that has indicted petitioner, it is enough to have direct evidence based on the statements of the jury commissioners in the very case. Discrimination may be proved in other ways than by evidence of long-continued unexplained absence of Negroes from many panels. *The statements of the jury commissioners that they chose only whom they knew,* and that they knew no eligible Negroes in an area where Negroes made up so large a proportion of the population, prove the intentional exclusion that is discrimination in violation of petitioner's constitutional rights." (our emphasis).

In *Whitus* v. *Georgia, supra,* the Negro population was 45% of the total population in the area involved; 27.1% of the taxpayers were Negro and 42% of the males over 21 years of age were Negro. After the jury list was revised under court order in *Whitus,* only three of the 33 prospective jurors were Negro and none served on a 19 member grand jury. The jury commissioners in that case made up the jury venires from tax records which were kept on a segregated basis and the jury commissioners selected prospective jurors on the basis of personal acquaintance. Only seven of the 90 persons from which the petit jury was selected were Negro and none were accepted on the petit jury. While the *Whitus* case contained elements not present in the case at bar, the Supreme Court in *Whitus* said:

"Under such a system the opportunity for discrimination was present and we cannot say on this record that it was not resorted to by the commissioners. Indeed, the disparity between the percentage of Negroes on the tax digest (27.1%) and that of the grand jury venire (9.1%) and the petit jury venire (7.7%) strongly points to this conclusion. Although the system of selection used here had been specifically condemned by the Court of Appeals, *the State offered no testimony as to why it was continued on*

*retrial. The state offered no explanation for the disparity between the percentage of Negroes on the tax digest and those on the venires,* although the digest must have included the names of large numbers of 'upright and intelligent' Negroes as the statutory qualification required. In any event *the State failed to offer any testimony indicating that the 27.1% of Negroes on the tax digest were not fully qualified.* The State, therefore, failed to meet the burden of rebutting the petitioners' prima facie case." (Our emphasis).

In the case of *Bailey* v. *Henslee,* 287 F. 2d 936, above referred to, the Eighth Circuit Court of Appeals in granting habeas corpus said:

"In avoiding racial discrimination in the selection of jurors it is not enough for the jury commissioners or any other selecting agency to be content with persons of their personal acquaintance. Smith v. State of Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 85 L.Ed. 84; Hill v. State of Texas, 316 U.S. 400, 404, 62 S.Ct. 1159, 86 L.Ed. 1559. It is 'their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color.' Cassell v. State of Texas, supra, at page 289 of 339 U.S., at page 633 of 70 S.Ct."

In the 1940 case of *Smith* v. *Texas,* 311 U.S. 128, the Supreme Court said:

"Where jury commissioners limit those from whom grand juries are selected to their own personal acquaintance, discrimination can arise from commissioners who know no negroes as well as from commissioners who know but eliminate them. If there has been discrimination, whether accomplished ingeniously or ingenuously, the conviction cannot stand."

In *Vanleeward* v. *Rutledge,* 369 F. 2d 584, the court citing from the Fifth Circuit case of *Scott* v. *Walker,* 358 F. 2d 561, said:

"It is plain from the record here that the commissioners put on the list only those personally known to them. They made no especial effort to ascertain whether there were qualified Negroes in the parish for jury service. In failing to do so they violated the rule announced by the Supreme Court through Mr. Justice Reed in Cassell v. Texas, where it was said, 'When the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color. They did not do so here, and the result has been racial discrimination.' 339 U.S. 282 at 289, [70 S.Ct. 629, 633, 94 L.Ed. 839.]'"

Returning now to the facts and evidence in the case at bar; at the time of Williams' trial, the payment of a poll tax was necessary under the statute (Ark. Stat. Ann. § 3-107 [Repl. 1956]) to become a qualified elector in Arkansas. Under Ark. Stat. Ann. § 3-118 (Repl. 1956) the tax collector was required to file with the county clerk "a list containing the correct names, alphabetically arranged (according to the political or voting townships, and according to color) of all persons who have up to and including October 1st of that year paid the poll tax assessed against them respectively." The county clerk was then required to record the list in a bound book and to deliver same to the county election commissioners for use in ascertaining the qualfied electors as they appeared at polling places for casting ballots.

The statutory qualifications for grand and petit jurors under Ark. Stat. Ann. §§ 39-206—39-208 (Repl. 1962) required that they be,

". . . [E]lectors of the county . . . persons of good character, of approved integrity, sound judgment and reasonable information. . . ."

The circuit judge was required to select three jury commissioners of statutory qualifications whose duty it was to select the grand and petit juror list. Ark. Stat. Ann. § 39-225 (Repl. 1962) provided that any person who served on the regular panel of the petit jury

would be ineligible to serve on a subsequent panel for a period of two years. Consequently, the jury commissioners in the case at bar followed the usual and customary procedure of using the poll tax list as the most convenient and accurate aid in determining who are "electors of the county" in selecting jury veniremen, and also, used prior jury lists in determining who is disqualified by recent prior service.

Returning now to the selection of the jury panel in this case, it was stipulated at the Rule No. 1 hearing that the 1964-65 poll tax list used by the jury commissioners in selecting the jury panel for the 1964 October term of the circuit court in Ashley County, contained the names of 8,656 qualified electors and that 25% of them were Negro. The jury panel for the October 1964 term of court here involved consisted of 60 members. Four of the members, or 6.67% of the panel, were Negro. The important question then is whether this disparity between the 25% qualified Negro electors in Ashley County and the 6.67% selected for jury service, was the result of excluding Negroes from jury service because of their color or race. Of course, unexplained prior, or "systematic," exclusion of Negroes from jury service would leave the inference they were excluded because of their race if no other explanation is given; consequently, prior, or systematic, exclusion is admissible in evidence in support of a claim of intentional exclusion because of race in a given case. The evidence on this point, in the case at bar, includes the percentage of Negroes on the jury panels for a ten year period prior to the October 1964 term here involved. These percentages vary from none in two adjourned March 1960 terms to 24% in one adjourned March term, but they average only 9.42%.

The three jury commissioners who selected the jury panel from which the jury was selected in this case were called by the appellant and testified at his Rule No. 1 hearing. On direct examination all three were questioned on collateral matters apparently aimed at bringing to the surface any personal feeling that could be interpreted as racial prejudice, such as to their membership in the NAACP or any predominately Negro civic and social organizations, and as to whether the membership of the churches to which they belong were predominately black

or white. As to the actual question involved on this appeal, we deem it unnecessary to set out the testimony of the commissioners in detail but, Mr. Charles Grassi, one of the commissioners, testified that in selecting the jury panel the commissioners were furnished a list of the jurors for the past several years which they used in determining who was eligible to serve. He testified that they were also furnished with a county poll tax list and that as he recalls, the poll tax list did designate the race beside the name of each of the qualfied electors. He then said:

> "Of course, there was three of us. We went down the lists and if one or three of us knew the man that was under discussion and knew who he was, we would see if he was qualified, a registered voter."

Mr. Grassi testified that they tried to pick the members of the jury panel from different sections of the county, and that he was acquainted with Negroes who lived in and around Crossett. He said that he did not know them personally but knows them by name and when he sees them. He said he did not know them well enough to know what occupation they were engaged in but did know 20 or 25 of them well enough to know their general character. He said that the trial judge instructed the commissioners to select people of sound judgment, proven integrity and reasonable information, and that the jurors should be selected without regard of race, creed or color. He said that in determining the qualifications of the members of the jury panel he based his opinion mainly on his personal observations of the ones selected. He testified that he made no effort to famaliarize himself with the character, judgment and integrity of the Negroes in the county with whom he was not already personally acquainted. He said he was personally acquainted with perhaps 20 or 25 Negroes and perhaps 250 white people in and around Crossett well enough to accurately estimate their character.

Mr. Allen Cameron, another one of the commissioners, testified that he had lived in Ashley County since 1953 and is personally acquainted with 40 or 50 Negroes who live outside the city of Crossett, and that a majority

of these individuals work for the same company he works for. He said he is acquainted with perhaps six or 12 Negroes who live inside the city of Crossett. He said he is personally acquainted with 150 or 200 white people living in Ashley County outside the city of Crossett and perhaps 1,000 living inside Crossett. He said he had no knowledge of the education or qualifications of the Negroes he knows in Crossett and does not know whether any of them have criminal records or not. He testified that he made no particular effort to ascertain the qualifications of Negroes or whites living in the community with whom he was not already acquainted.

Mr. Ray Phillips, the third commissioner, testified that he is a general merchant living in Fountain Hill, and had been a merchant in Ashley County for 42 years. After being asked if the members of his church were all white or all Negro, Mr. Phillips readily admitted that he does not believe in white and black people attending school or eating in cafes together, however Mr. Phillips just as readily testified as follows:

"Q. So, you tell me whether you believe a negro man or a number of negroes should be able to sit in judgment of a white man accused of a capital crime? A. Well, if he is qualified, I'd just as soon have him as some of the others."

The substance of the remainder of Mr. Phillips' testimony was to the effect that he knew the people in his community and assumed that the other two commissioners knew the people in their respective communities; that he recommended for jury service the ones from his community he knew to be high class citizens and assumed the other commissioners did likewise.

From the overall testimony of the commissioners there is no question as to the procedure they followed in selecting the jury panel in this case. They simply examined the list of qualified electors and selected the jury panel from among the individuals on the list some member of the commission knew. When they would come to a name of a person one of the commissioners knew, that individual's qualifications (other than being

a qualified elector) would be discussed by the three commissioners and he would either be accepted for jury service or passed over, and the commissioners would then continue down the list to the next person with whom one of them was acquainted.

Crossett precinct is by far the most populated precinct in the county containing the names of 4,420 qualified electors of whom 16.0% were Negro according to the voting list in evidence. There were 25 white and one Negro jurors selected from this township. In "going down the list" in selecting the 26 jurors from this township, the commissioners started with R. L. Brooks, a white man, and ended with Richard Rogers, who is Negro. From the name of R. L. Brooks as it alphabetically appears on the voting list, to and including Richard Rogers, there are 2,414 white and 475 Negro electors listed. Consequently, the number of electors the commissioners were bound to have considered between the names of R. L. Brooks and Richard Rogers consisted of slightly less than 13% Negro and slightly more than 87% white. Of the 26 individuals selected 25 were white and one was Negro, making slightly less than 4% Negro and slightly more than 96% white.

Hamburg is the next largest voting precinct containing 1,720 qualified electors of whom 11.3% were Negro. By the same process, between the first and last name selected from this township, the commissioners were bound to have considered the names of 1,375 white and 180 Negro electors, making a total of 1,555 individual names of whom slightly less than 12% were Negro and slightly more than 88% were white. There were 15 jurors selected from this precinct all of whom were white.

There was a total of 322 qualified electors listed in Fountain Hill precinct of whom 44, or 13.7%, were Negro. There were 12 members of the jury panel selected from this precinct, all of whom were white. The remaining seven jurors were selected from Wilmot, Boydell, Portland and Parkdale precincts, with two Negroes and two whites being selected from Wilmot precinct which contains 143 listed white electors and 122 Negro electors.

It is obvious that in selecting a jury venire of 60 from a list of 8,656 qualified jurors in a county, there

are many times more individuals eligible for jury service than there are positions to be filled. It is, of course, a matter of common knowledge that there are many reasons why many qualified electors would be passed up for jury service in preference to the ones selected. It may be that jury commissioners would pass up some individuals for jury service for economic reasons in recognition of unusual hardships in individuals sacrificing their daily wages for the amount paid for jury service. It is entirely possible that persons working in industry who have the qualifications for good jurors would also be working at jobs on which other jobs depend and in many instances jobs not easily filled by temporary assignment while the regular employee serves on a jury. It may be that jury commissioners take into consideration the handicap to the employer as well as to the employee in such cases in requiring the individual to leave his job and serve on juries. The same situation may apply in agricultural sections of the state in the so-called "busy season" of the year (planting and harvest time) and, of course, many legally qualified electors may not possess the education, sound judgment, experience or temperament to sit as jurors and intelligently apply the law as given in instructions to intricate and complicated facts and render a fair and impartial verdict in a given case. Be that as it may, no such reasons were given for excluding anyone for jury service in the case at bar. As a matter of fact the substance of the commissioners' testimony in the case at bar places them squarely within the prohibition announced in the cases above cited. They simply went down the list of the qualified electors of the county and selected the jury panel from among the individuals with whom they were personally acquainted. As already pointed out, this procedure has been condemned by the United States Supreme Court when it results in considerable disparity between the races. Consequently, when jury commissioners select jury panels only from the people with whom they are acquainted, they should be prepared to show that they are as widely acquainted with one race as with the other in the involved area; and when they select a high percentage of white jurors from a list containing the names of a high percentage of Negroes, the state must be prepared to explain the discrepancy and affirmatively show why the names of eligible

Negroes were passed over in preference of eligible whites. This was not done in the case at bar.

We regret that at this late date Ashley County must be put to the expense, inconvenience and ordeal of again trying Williams for that county's most brutal crime which occured more than eight years ago. The question of whether Williams was guilty of the crime for which he was convicted, or whether he was tried by a fair and impartial jury, or whether his rights were prejudiced by a trial before an all white jury, is not involved on this appeal. Williams had no constitutional right to have Negroes on the jury before whom he was tried and he had no constitutional right to have Negroes on the panel from which the jury was selected for his trial. He was, however, entitled to be tried before a *legally constituted* jury and a jury from which members of any race have been excluded simply because of their race, is not a legally constituted jury.

It is clear that under the United States Supreme Court decisions, *supra,* a prima facie case of racial discrimination appears on the face of the record in this case and there was no evidence offered to rebut it. Therefore, it is also clear, that we have no other alternative, under the United States Supreme Court decisions, than to reverse the judgment in this case because of unrebutted evidence of racial discrimination in the selection of the panel notwithstanding the fact that the selection was made under a jury selection system that has now been abandoned by appropriate legislation in Arkansas.

The judgment is reversed and this case remanded for a new trial.