**Joe Grady MURRAH, Appellant,**

v.

**STATE OF ARKANSAS, and A. L. Lockhart, Superintendent, Cummins Unit, Arkansas Department of Correction, Appellees.**

**No. 75–1190.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1975.

Decided March 15, 1976.

Rehearing and Rehearing En Banc Denied April 6, 1976.

James H. Pilkinton, Jr., Hope, Ark., for appellant.

Terry R. Kirkpatrick, Asst. Atty. Gen., Little Rock, Ark., James Guy Tucker, Atty. Gen., for appellees.

Before CLARK, Associate Justice,* and LAY and ROSS, Circuit Judges.

LAY, Circuit Judge.

Two issues are presented in this appeal from a denial of a writ of habeas corpus to an Arkansas state prisoner: (1) whether the district court erred in failing to require disclosure of an informant's identity under the principles of *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957);[1] and (2) whether the procedures employed by the State of Arkansas in selecting a petit jury were violative of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.[2]

We need only address the second issue since the trial court, upon a limited remand order from this court, held an *in camera* evidentiary hearing in the presence of peti-

tioner's counsel where the name of the informant was revealed by law enforcement officials.[3]

■ Petitioner asserts that the Arkansas statute [4] requires the use of voter registration lists in the overall composition of a petit and grand jury. It is claimed this discriminates against unregistered citizens and therefore does not reflect a fair cross-section of the community required by the Sixth and Fourteenth Amendments. This claim is without merit.

It has been uniformly held that persons not registered to vote do not constitute a distinct and identifiable group such that there has been an intentional, systematic exclusion of a distinct class. *See, e. g., Hallman v. United States*, 490 F.2d 1088, 1092 (8th Cir. 1973); *United States v. Parker*, 428 F.2d 488, 489 (9th Cir.), *cert. denied*, 400 U.S. 910, 91 S.Ct. 155, 27 L.Ed.2d 150 (1970); *United States v. Butera*, 420 F.2d 564, 568 n.7 (1st Cir. 1970); *Camp v. United States*, 413 F.2d 419, 421 (5th Cir. ), *cert. denied*, 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434 (1969); *United States v. Kelly*, 349 F.2d 720, 778 (2d Cir. 1965).

There has been no showing that the voter lists were compiled with the intentional exclusion of any particular social, religious, economic, geographical or political group. *See Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Swain v. Alabama*, 380 U.S. 202, 205, 85 S.Ct. 824, 827, 13 L.Ed.2d 759, 764 (1965).

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

1. Where the disclosure of an informant's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. *Roviaro v. United States*, 353 U.S. 53, 60–61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639, 645 (1957).

2. Petitioner has exhausted state remedies on both issues. *See Murrah v. State*, 486 S.W.2d 897 (Ark.1972).

3. No showing was made that the disclosed informant, now deceased, possessed material information which might have provided exculpa-

tory evidence for the petitioner in the defense of the state charges of burglary and grand larceny. Defendant originally asserted this claim on the ground that if the informant was the other participant in the alleged crime, defendant was unlawfully entrapped by a conspiracy involving the informant-participant and law enforcement officers. Upon remand it was disclosed that the informant was not the other participant in the crime. Under these circumstances defendant's claim need not be further pursued.

4. Ark.Stat.Ann. § 39–201 *et seq.* (1973 Cum. Supp.).

Petitioner's second attack on the Arkansas statute presents a more serious question. Petitioner asserts that there has been a purposeful exclusion or underrepresentation of blacks from the jury panel in Miller County, where he was tried.[5]

The fundamental question before us is whether, on this record, petitioner has made a prima facie case of jury discrimination.

There are several methods of demonstrating a prima facie case of jury discrimination. Here, petitioner attempted to demonstrate a substantial disparity between the percentage of blacks presumptively qualified and the percentage of blacks actually chosen for the jury venire, coupled with a demonstration that the jury selection procedure provides an opportunity to discriminate. *Cf. Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); *Singleton v. Estelle*, 492 F.2d 671, 677 (5th Cir. 1974).

Under the procedures followed in Miller County, jury commissioners appointed by the court selected some 800 names chosen from the voter registration lists of Miller County to be placed in a jury wheel. From this master list, 80 names were drawn randomly and of that group 52 individuals reported. Two of the 52 were black. The parties stipulated that the racial composition of the "over 21" population in Miller County, Arkansas at the time of petitioner's trial in December, 1971, was: (1) 4,017 members of the black race; and (2) 16,341 non-blacks, for a total "over 21" population of 20,358. The percentage of blacks in Miller County was 19.7318% and the percentage of all others is 80.2682%. Petitioner urged that this data demonstrates the existence of a substantial disparity between the percentage of blacks available for service on defendant's jury panel and the percentage of "over 21" blacks in the county. It is urged that this disparity coupled with the "key man" system used creates a prima facie case of discrimination. The Arkansas Supreme Court observed:

> We do not believe that, under the facts here shown, appellant has made a prima facie case of racial discrimination. There is here no showing of a previous and persistent racial discrimination in the selection of jurors in the county. The odds against drawing only two Negroes out of 52 from a list of 800 comprising a cross section of the county containing from a 15% to 20% population are pretty great, but one occasionally draws a perfect hand in a card game even though the odds are greater than 6,000,000 to 1. Therefore, we conclude that, when the jury commissioners comprise a cross section of the county according to race, a showing only that a single panel does not correspond to the racial make-up of the community, does not of itself make a prima facie case of racial discrimination.

486 S.W.2d at 899.

The federal district court agreed.

In view of this panel's summary affirmance of *Sanford v. Hutto*, 394 F.Supp. 1278 (E.D.Ark.), *aff'd*, 523 F.2d 1383 (8th Cir. 1975), in which the district court found a prima facie case under somewhat similar circumstances, in St. Francis County, Arkansas, we remanded the instant cause for a further evidentiary hearing before the district court.[6] We did so because we felt the record was deficient as to certain facts. Regardless of the percentage of blacks in

---

**5.** Although petitioner is white, he has standing to challenge the purposeful exclusion of blacks. *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972).

**6.** Our remand order read, in part:

It is further ordered that the district court conduct an evidentiary hearing to determine within a reasonable degree of approximation the racial composition of the 800-name jury list selected by the ten jury commissioners from which the petit jury for the case of *State of Arkansas v. Joe Grady Murrah* was

drawn. The district court is further ordered to determine within a reasonable degree of approximation the racial composition of the 80 persons drawn from the 800-name pool. The district court shall make this determination by affidavit or oral examination obtained from the ten jury commissioners and their lists submitted and counsel may supplement the record by interrogation of the jury commissioners as to the manner in which they selected the 800 names.

the 52 who responded or of the 80 veniremen called, the primary investigation must be directed at the number of blacks included in the original list of 800 names placed in the master wheel. Whether there was any underrepresentation or exclusion of any distinct group in compiling the master jury list is the critical inquiry in investigating this charge of racial discrimination. *Cf. Swain v. Alabama, supra.*

At the evidentiary hearing, nine of the ten jury commissioners each received the list of the 800 names which were submitted by them as jury commissioners, from which the defendant's jury panel was drawn. The absent commissioner, one of the two blacks, was unable to participate due to poor health. Working individually, each commissioner marked each person on the list whom they knew to be black. The nine lists revealed that 45 of the 800 persons on the master jury list were known to be black—or 5.625%. The court also asked five other individuals to go over the list in the same manner. All 45 of the individuals listed by the jury commissioners were acknowledged to be black and this panel added 13 names who were "believed to be black", totaling 58 of the 800 or 7.25%. Using these figures the disparity between the "over 21" black population in Miller County and the percentage of blacks on the master jury list is between 12.48 and 14.11%. The record, however, is still barren of the total number of registered voters or the total number of blacks who were registered in Miller County in 1971.[7]

Thus, the question we face is whether under these facts, the number of registered voters is a sine qua non to prove a prima facie case of jury discrimination. Although these figures may be helpful, the total number of registered voters has not been essential to such a showing. The Supreme Court in *Turner v. Fouche, supra,* notwithstanding the availability of voter registration lists, held the difference between the percentage of blacks placed in a jury wheel and the general black population to be sufficient proof of a substantial disparity. Although the total number of persons registered to vote in 1971 would not be difficult to obtain, this list no longer contains any racial designation and using the methodology of *Sanford* only approximate percentages could be obtained. Moreover, required reliance on voter registration lists might effectively preclude anyone from ever showing a "substantial disparity" in the racial composition of those eligible and those actually called to jury duty. A prohibitive burden should not be cast on the petitioner. *Cf. United States v. Butera,* 420 F.2d 564, 571 (1st Cir. 1970).

In *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Supreme Court stated that underrepresentation of as much as 10% on a given jury panel would not constitute evidence of a prima facie case. However, as noted by Judge Henley in *Sanford,* the *Swain* case involved no evidence that there had been any attempt to apply valid juror qualifications in a discriminatory manner. In *Sanford,* where there was evidence of an opportunity to discriminate in the selection procedures, we held that a disparity of "at least 14%" was substantial. 394 F.Supp. at 1282. In *Stephens v. Cox,* 449 F.2d 657, 659 (4th Cir. 1971), the court found that where 15% on the jury lists were black and about 30% of the general population was black, the disparity—when coupled with a showing of an opportunity to discriminate—was sub-

---

7. In the *Sanford* case, Judge Henley, then serving as a district judge, was faced with a different problem. The record revealed the total number of registered voters but not the total number of black registered voters. His methodology for determining the disparity was as follows: He determined the least possible number of black voters by subtracting the total white population (W) from the total number of registered voters (RV): [(RV) – (W) = Least possible number of black voters.] The same method was used to find appropriate percentages where less than 100% white registration was assumed; where the variable (X%) stood for the assumed percentage of the white population which has registered, the equation is: (RV) – [(X%)(W)] = Number of black voters. When coupled with the key man system, Judge Henley held that a 14% disparity between black registered voters and the percentage of blacks placed in the jury wheel was substantial.

stantial. In *Blackwell v. Thomas*, 476 F.2d 443, 447 (4th Cir. 1973), the Fourth Circuit found that a stipulated underrepresentation of as low as 6%, 9% and 12% might constitute a substantial disparity—at least enough to warrant an evidentiary exploration of the administration of the jury selection statutes. There, the Fourth Circuit stated:

> When *Carter v. Jury Commissioner*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 . . . (1970) and *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 . . . (1970) are closely studied, it is obvious that what constitutes a "substantial disparity" depends in large part upon the mechanism by which any disparity results. If the disparity proceeds from objective criteria, i. e., age, educational attainment, registration to vote, etc., the 10% test of *Swain* may be safely employed. But if the disparity proceeds from the application of subjective tests, under which there is wide opportunity for intentional racial discrimination, the tolerable disparity is diminished.

476 F.2d at 447 n. 7.

We turn then to the mechanics by which the jury was selected to ascertain whether there existed an opportunity for discrimination.

Although the Arkansas statutory scheme does not explicitly require the application of subjective criteria, neither does it mandate a random selection system. Here 10 jury commissioners were chosen, two of which were black. The evidentiary hearing disclosed that the commissioners chose people with whom they were acquainted and whom they thought would be good jurors. Mr. House, a white commissioner, said: "I tried to pick people that I thought would be reliable [and] fair." Mr. Ruggles said that he was asked to select people of good character, good standing and those who would give people a fair trial. He selected people who resided in his geographic area—all of whom were white. The testimony of the two black commissioners may reveal additional reasons for the existing disparity. Lee Childs, one of the two black commis-

sioners, testified that he submitted the names of more black persons than white; however, the other black commissioner, Mrs. Wade, stated that she just picked one or two whom she knew to be black and the rest white.

■ All of the commissioners testified that they did not intentionally discriminate against any racial group. However, such general denials are inadequate to rebut a prima facie case of jury discrimination. *Alexander v. Louisiana*, 405 U.S. 625, 631–32, 92 S.Ct. 1221, 1225–26, 31 L.Ed.2d 536, 542 (1972). The guidelines given to the commissioners prior to the selection of the names, although urging cross-sectional representation, contain subjective criteria which told the commissioners to exclude persons "not of good character or approved integrity, [or who] are lacking in sound judgment," and not to choose persons who did not maintain "good behavior".

■ Judge Henley so aptly observed the problem of using subjective criteria in *Sanford*:

> [T]he commissioners could only choose persons with whom they were personally acquainted or persons who had been recommended to them by other responsible citizens. . . . The result is that a given jury selected by these commissioners is only an extension of the commissioners' personalities. . . . Obviously, an opportunity to discriminate existed since, if each commissioner chose only those persons he knew, then he was aware of the race of each person considered.

394 F.Supp. at 1282–83.

In *Sanford*, the district court also relied on *Smith v. Texas*, 311 U.S. 128, 132, 61 S.Ct. 164, 166, 85 L.Ed. 84, 87 (1941) where the Supreme Court observed:

> Where jury commissioners limit those from whom grand juries are selected to their own personal acquaintance, discrimination can arise from commissioners who know no Negroes as well as from commissioners who know but eliminate them. If there has been discrimination, whether

accomplished ingeniously or ingenuously, the conviction cannot stand.

And as said in *Turner v. Fouche*, the opportunity to discriminate required for a prima facie case is shown when a party has demonstrated that the disparity originated, at least in part, at the one point in the selection process where the jury commissioners invoked their subjective judgment rather than objective criteria.

396 U.S. at 360, 90 S.Ct. at 540, 24 L.Ed.2d at 579.

Consistent with this court's decision in *Sanford*, we find the petitioner has established a prima facie case of jury discrimination. The state may attempt to rebut this testimony by actual evidence that a substantial disparity did not in fact exist. However, we observe that as long as a key man system prevails, utilizing subjective criteria, any disparity is more suspect and the state carries a heavy burden.

The cause is reversed and remanded for further proceedings in accord with this opinion.