Gregory Louis WATERS and Carl ADAMS
*v.* STATE of Arkansas

CR 80-115                                    607 S.W. 2d 336
Supreme Court of Arkansas
Opinion delivered November 10, 1980

34

*E. Alvin Schay*, State Appellate Defender, by: *Jackson Jones*, Deputy Defender, for appellants.

*Steve Clark*, Atty. Gen., by: *James F. Dowden*, Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Chief Justice. Appellants were tried

jointly on separate charges of rape, allegedly committed upon Christopher Kanniard on March 4, 1979. Both were found guilty. Gregory Louis Waters was sentenced to 30 years imprisonment and fined $10,000. Carl Adams was sentenced to life imprisonment and fined $15,000. From these judgments pursuant to the jury verdict, appellants bring this appeal asserting four grounds for reversal. We find reversible error on only one of them, i.e., the allegation that the jury wheel selected for the year by the jury commissioners did not represent a fair cross-section of Howard County as a result of discrimination against black people.

As unusual procedure seems to have been followd. No written motion was filed. No motion was made until after a jury had been selected. At that time, the attorney for Adams moved to quash the panel because "the percentage of black people in the jury wheel is not sufficient." The attorney for Waters joined in this motion. The trial judge, sitting on assignment, denied the motion, saying that he was unfamiliar with the jury selection process in this circuit court but felt sure that whatever substance there was in the motion could be reached. He found it necessary, at that time, to proceed with the trial. The jury returned a verdict of guilty on September 21, 1979.

On October 10, 1979, a hearing was commenced on the motions of Waters and Adams to quash the jury panel. This hearing continued on November 5 and 6. One of the jury commisioners testified that the regular circuit judge, who later disqualified himself, had instructed the jury commissioners, by which the jury panel was selected, to use their "discrimination" and select they thought should serve on a jury. Undoubtedly, the commisioners were actually told to use their discretion.

The Sheriff of Howard County testified that he knew nearly everyone in Howard County. He testified that he had examined the master list of 600 names drawn from the jury wheel selected by the jury commissioners and testified that there were definitely 23 blacks on the list and possibly three or four more. He said that of the 100 names on the panel for the trial of this case, four were black. The Sheriff estimated

that black people constituted 20 percent of the total population of the county. This estimate finds support in the fact that the census report for 1970 shows that the percentage of black people in the Howard County population was 20.32. Of those over the age of 21 years, 17.21 percent were black and of those over 18, 17.73 percent were black.[1] Even 27 black persons on the list of names placed in the jury wheel would constitute only 4.5 percent.

Each of the five jury commissioners, four of whom were white, selected names for the jury wheel from persons they knew. The Commissioners were told that each of them should select between 150 and 200 names for the jury wheel. The sole black commissioner submitted only 100 names. Three of the commissioners selected 90 to 100 percent of the names they listed from persons known to at least one of them personally, and the remainder at random. One of the commissioners said that she knew, or knew of, 200 or 300 black persons who would be qualified for jury service and thought she named *one* of them on her list of about 150. She listed only the names of persons she knew. They were taken from a part of the voter registration list which contained at least 300 names. One commissioner who lived in Nashville said that he selected people from the Nashville area but that he also selected a lot he did not know by picking them at random from outlying communities. He operated a manufacturing plant at Nashville at which 75 percent of the employees were black. He picked several of those workers. He could not remember seeing any names of persons from Dierks, Tollett or Nashville on the list furnished him for selection purposes. Another commissioner said that he selected five black persons for the master list, but most of the persons he selected were from Dierks, where he operated a hardware store and had lived all his life, and where there were only two black people. Another commissioner lived in a community around Umpire where there was not a single black person.

According to the sheriff, there are two communities in the county, Tollett and Longview, in which the black popula-

---

[1]The total population of Howard County as of 1970 was 11,412 with 2,319 blacks. In the over 18 category, the voting population, 1,397 were black out of a 7,877 total.

tion exceeds 20 percent. He said that there were probably 300 voters in Tollett, where black people constitute 90 percent of the population. In the Longview community, the population is 50 percent black. On two panels of 100 names each, which had previously been drawn from the master list, there were ten black persons, but none were from either Tollett or Longview.

Before we can hold for appellants on this issue, we must answer two questions in the affirmative. First, did appellants make a prima facie showing of racial discrimination in the jury selection process? And, if so, was it rebutted by the state? We find that a prima facie case was made but not overcome.

A black defendant is not entitled to a jury containing members of his race or to demand a proportionate number of his race on a venire or jury roll from which the petit jury is drawn. *Swain* v. *Alabama*, 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965); *Hernandez* v. *Texas*, 347 U.S. 475, 74 S. Ct. 667, 98 L. Ed 8966 (1954); *Apodoca* v. *Oregon*, 406 U.S. 404, 92 S. Ct. 1628, 32 L. Ed. 2d 184 (1972); *Williams* v. *State*, 254 Ark. 799, 496 S.W. 2d 395; *Turner* v. *State*, 258 Ark. 425, 527 S.W. 2d 580. It is the state's purposeful or deliberate denial to Negroes, on account of race, of participation in the administration of justice by selection for jury service, that violates the equal protection clause. *Swain* v. *Alabama*, supra; *Castaneda* v. *Partida*, 430 U.S. 482, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977). A defendant in a criminal case is entitled to require that the state not deliberately or systematically deny to members of his race the right to participate, as jurors, in the administration of justice. *Alexander* v. *Louisiana*, 405 U.S. 625, 92 S. Ct. 1221, 31 L. Ed. 2d 536 (1972); *Apodaca* v. *Oregon*, supra.

The primary question must be directed to the number, or percentage, of black persons on the original list placed in the jury wheel, since the drawing of names from the panel is random. The burden of showing facts which permit an inference or purposeful exclusion or limitation for jury service on account of race is on the defendant. *Williams* v. *State*, supra. Purposeful discrimination is not satisfactorily proven

by showing that an identifiable group in a community is underrepresented by as much as 10 percent, because such a disparity, standing alone, reflects no studied attempt to include or exclude a specified number of that group. *Swain* v. *Alabama*, supra. Here there was a disparity of 15.82 percent (20.32-4.5). In considering whether appellants have made the required showing, comparison of the proportion of blacks in the total population to the proportion called to serve is the test. *Castaneda* v. *Partida*, supra.

In order to make a prima facie case, a substantial disparity or underrepresentation must be shown. *Castaneda* v. *Partida*, supra. We must determine, as best we can, what constitutes a substantial disparity. It seems that a disparity of 18 percent strongly points to the conclusion that discrimination is present. *Whitus* v. *Georgia*, 385 U.S. 545, 87 S. Ct. 643, 17 L. Ed. 2d 599 (1967). We have held that a 21.5 percent disparity is sufficient as a basis for establishing a prima facie case. *Hall* v. *State*, 259 Ark. 815, 537 S.W. 2d 155. We seem to have also found a disparity of 18.33 percent to be sufficient. *Williams* v. *State*, supra. On the other hand, we appear to have found that a disparity of 12.5 percent was not sufficient. *Turner* v. *State*, supra. The disparity shown here appears to us to afford an adequate basis for a finding that a prima facie case has been shown. See *Sims* v. *Georgia*, 389 U.S. 404, 88 S. Ct. 523, 19 L. Ed. 2d 634 (1967), where the disparity was 14.6 percent.

We are not unmindful of our decision in *Murrah* v. *State*, 253 Ark. 432, 486 S.W. 2d 897, which would lead to a contrary conclusion. The United States Court of Appeals for the Eighth Circuit disagreed with us. *Murrah* v. *Arkansas*, 532 F. 2d 105 (8th Cir., 1976). We do not concede that our decision in *Murrah* is not controlling here solely on the basis of the contrary conclusion by the Eighth Circuit. Decisions of the United States Supreme Court subsequent to our decision in *Murrah* do, however, lend support to the decision of the Eighth Circuit rather than to ours. See *Castaneda* v. *Partida*, supra. Our own cases of *Williams* v. *State*, supra, and *Hall* v. *State*, supra, seem to lead to a conclusion different from that we reached in *Murrah*.

A substantial disparity between the percentage of blacks

in the population and the percentage in the jury wheel, standing alone, is not sufficient to make a prima facie case of discrimination. *Thomas* v. *Texas*, 212 U.S. 278, 29 S. Ct. 393, 53 L. Ed. 512 (1909); *Akins* v. *Texas*, 325 U.S. 398, 65 S. Ct. 1276, 89 L. Ed. 1692 (1945). See also, *United States* v. *Test*, 550 F. 2d 577 (10 Cir., 1976). There must also have been either positive indicia of discrimination or proof that the selection procedure provided an opportunity for discrmination. *Turner* v. *Fouche*, 396 U.S. 346, 90 S. Ct. 532, 24 L. Ed. 2d 567 (1970); *Hall* v. *State*, supra; *Turner* v. *State*, supra; *Murrah* v. *State*, supra. Where the selection is committed to the discretion of jury commissioners, the use of their subjective standards in the exercise of that discretion may afford that opportunity. If the disparity originated at a point where the commissioners invoked their subjective judgment rather than objective criteria, then the prima facie case is complete. *Turner* v. *Fouche*, supra. The "key man" system which relies upon the jury commisioners to select from the community at large is a highly subjective process which is subject to abuse. *Castaneda* v. *Partida*, supra. A system similar to the one used here has been characterized as a "key man" system. *Murrah* v. *Arkansas*, supra.

The evidence here is overwhelming that the commissioners did apply subjective standards. Only one commissioner said that he selected any names at random. He said that he did this by trying to select a certain number from each outlying community from a list, but he could not remember seeing names from Dierks, Tollett, or Nashvile, the place he lived and did business. One attributed the presence of only five black persons on his list to the fact that there were no black people in Dierks, where he lived and operated a store, and only two in that part of the county. Ninety percent of the list another commissioner submitted was selected from people he knew personally or by representation. He knew very few black people. He "guessed" that none of those on this list he did not know were black. Of the 10 percent he picked at random, he could not say which were black and which were not.

It was proper for the jury commisssioners to be instructed to select persons who have the courage of their convictions and are honest, trustworthy, fair-minded and impartial.

None of the jury commissioners made any effort to ascertain any information about persons not personally known to them, or one of them. Where the statutory scheme vests wide discretion in the selection of persons for jury duty and, in exercising that discretion, selection of names for a jury list is limited to the commissioners' own personal acquaintances, discrimination can arise from commissioners who know no Negroes, as well as from those who know, but eliminate, them. *Smith* v. *Texas*, 311 U.S. 128, 61 S. Ct. 164, 85 L. Ed. 84 (1940). It is the constitutional duty of jury commissioners not to pursue a course of conduct in the administration of their offices which would operate to discriminate in the selection of potential jurors on racial grounds, and that duty may be violated by a failure to make an effort to ascertain the identity of members of the black race in the county who were qualified to serve as jurors. *Hill* v. *Texas*, 316 U.S. 400, 62 S. Ct. 1159, 86 L. Ed. 1559 (1942). In *Hill*, the United States Supreme Court said:

> ***Discrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case discrimination necessarily results where there are qualified negroes available for jury service. ***

Unfamiliarity with Negroes in the county and an inadequate arrangement for remedying this deficiency do not permit us to assume that further inquiry would not have led to the discovery of additional qualified persons of the black race in Howard County. *Turner* v. *Fouche*, 396 U.S. 346, 90 S. Ct. 532, 24 L. Ed 2d 567 (1970). The extent of the racial disparity in the percentage of names placed in the jury wheel coupled with the opportunity of the jury commissioners to discriminate by the application of subjective standards made a prima facie case of racial discrimination.

Upon establishment of a prima facie case, the state has the burden of rebutting the inference of intentional discrimination by showing that constitutionally permissible procedures were followed in the selection of the names to be placed in the jury wheel. *Castaneda* v. *Partida*, 430 U.S. 482, 97

S. Ct. 1272, 51 L. Ed. 2d 498 (1977); *Turner* v. *Fouche*, supra; *Taylor* v. *Louisiana*, 419 U.S. 522, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1974); *Alexander* v. *Louisiana*, 405 U.S. 625, 92 S. Ct. 1221, 31 L. Ed. 2d 536 (1972); *Norris* v. *Alabama*, 294 U.S. 587, 55 S. Ct. 579, 79 L. Ed 1074 (1935). This requires the state to show that the results were reached through racially neutral selection criteria and procedures. *Alexander* v. *Louisiana*, supra.

The state attempts to meet its burden of proof and to justify the actions of the jury commissioners on the ground that no overt, purposeful racial discrimination has been shown and that none of the commissioners displayed any racial animus. There is no instance of any overt act. "Purposeful discrimination," however, need not be conscious, deliberate discrmination. *Hernandez* v. *Texas*, 347 U.S. 475, 74 S. Ct. 667, 98 L. Ed. 866 (1954).

The disavowal by the jury commissioners of discrimination, or of the intent to discriminate, was not sufficient to meet the burden of overcoming the prima facie case. *Hernandez* v. *Texas*, supra; *Norris* v. *Alabama*, supra; *Smith* v. *Texas*, supra. See also, *Avery* v. *Georgia*, 345 U.S. 559, 73 S. Ct. 891, 97 L. Ed. 1244 (1953). There may be unconstitutional discrimination even though it is not consciously done. *Hernandez* v. *Texas*, supra. Even the testimony of the commissioners here that they neither excluded or included anyone because of race is not sufficient to overcome a prima facie case. *Turner* v. *Fouche*, supra; *Whitus* v. *Georgia*, 385 U.S. 545, 87 S. Ct. 643, 17 L. Ed 599 (1967). See also, *Reece* v. *Georgia*, 350 U.S. 85, 76 S. Ct. 167, 100 L. Ed. 77, reh. den. 350 U.S. 943, 76 S. Ct. 297, 100 L. Ed 822 (1956); *Alexander* v. *Louisiana*, supra. It would not matter that at least one of the commissioners knew personally every qualified person in the county. *Sims* v. *Georgia*, 389 U.S. 404, 88 S. Ct. 523, 19 L. Ed. 2d 634 (1967).

The presumption that officials perform their duties properly is a factor which may be considered in determining whether there actually was discrimination. *Turner* v. *State*, supra. It will not, however, discharge the state's burden. *Jones* v. *Georgia*, 389 U.S. 24, 88 S. Ct. 4, 19 L. Ed. 2d 25 (1967). The fact that the jury commission was 80 percent white and

20 percent black, in the same proportion as the county's population, is also a circumstance which would tend to show that there was no intentional discrimination. *Murrah* v. *State*, 253 Ark. 432, 486 S.W. 2d 897. This fact would not itself be sufficient to rebut the prima facie showing. *Castaneda* v. *Partida*, supra. The testimony that the list submitted by the black commissioner contained only 100 names, while the other commissioners' contained 150 or more, because all the others had completed their lists when he had selected only 100 of the 150 names he was directed to submit tends to negate this factor. It was completely negated by this commissioner's testimony that he could find only eight names on the master list that he had put on his list and that he could not find other names of black persons from Shaw and Tollett he had listed. He could not remember having been furnished any list from which to choose names.

It is not enough that the commissioners honestly endeavored to discharge their duty, if they did, in fact, discriminate against black persons in the selection of the jury lists. *Thomas* v. *Thomas*, 212 U.S. 278, 29 S. Ct. 393, 53 L. Ed. 512 (1909). Since the opportunity for discrimination was present, we must be able to say that it was not resorted to before we can hold against appellants' convictions. *Alexander* v. *Louisiana*, supra. We are unable to do this.

We do not mean to suggest that only a random system of selection will meet constitutional standards. An imperfect system is not equivalent to purposeful discrimination. *Swain* v. *Alabama*, 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965); *Thomas* v. *Texas*, supra. Our statutes governing the selection of names to be placed in the jury wheel do not appear to be unconstitutional on their face because they are capable of being carried out without any racial discrimination whatever. *Brown* v. *Allen*, 344 U.S. 443, 73 S. Ct. 397, 97 L. Ed. 469 (1953); *Carter* v. *Greene County*, 396 U.S. 320, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970).

Although the evidence of the guilt of appellants is rather strong, the convictions of black defendants must be reversed where the evidence shows racial discrimination in the jury selection process. *Avery* v. *Georgia*, supra.

Appellants contend that the giving of a revised version of AMCI 301 by which the jury was told that if it had a reasonable doubt as to a defendant's guilt of all offenses, "you may find him not guilty" was reversible error. The revision occurred by substituting the word "may" for the word "must" in the instruction approved as AMCI 301. This was error but it does not constitute grounds for reversal. No objection was made, so the question arises for the first time on appeal. The error could have easily been corrected if it had been specifically pointed out. Appellant makes an argument that we should overlook the want of an objection to the instruction. This is an attempt to invoke a plain error rule, which we do not recognize. *Wicks* v. *State*, 270 Ark. 781, 606 S.W. 2d 366 (1980); *Smith* v. *State*, 268 Ark. 282, 595 S.W. 2d 671 (1980). This error is definitely not the exceptional type that calls for the court to correct as a serious one. See *Wicks* v. *State*, supra. The trial judge gave AMCI 110 by which the jury was informed that it must find a defendant guilty beyond a reasonable doubt, before returning a verdict of guilty and AMCI 109 on the presumption of innocence. When the instructions are considered as a whole, it is highly unlikely that the jury could have been misled. We have previously rejected the arguments advanced by appellants. *Haynes* v. *State*, 270 Ark. 685, 606 S.W. 2d 583 (1980). This error should not be repeated on retrial.

Appellant Adams also contends that the imposition of a life sentence upon him by a jury exercising "standardless discretion" violated his right to due process of law and denied him "rights guaranteed by the Eighth and Fourteenth Amendments." This issue is raised for the first time on appeal. We find no indication in the abstract of the record that Adams objected to the instructions given the jury by the trial court or to the verdict forms supplied to the jury. We find no request for any instruction affording guidelines to the jury for imposition of a life sentence. The suggestion that the absence of independent evidence to show that the 17-year-old victim suffered psychological injury by being forced to perform two separate acts of fellation upon Adams, as the jury found, would render the imposition of a life sentence improper, strikes us as being rather farfetched. In any event, the arguments advanced on this point are the same ones advanced and rejected by us in *Shepherd* v. *State*, 270 Ark. 457,

605 S.W. 2d 414 (1980) and *Wicks* v. *State*, supra. Upon the authority of those cases, we hold this argument to be without merit.

Appellants argue that there was insufficient evidence to support the jury verdicts against them. This argument is obviously an afterthought. Neither appellant ever moved for a directed verdict. Waters contends that the record is devoid of any evidence of any act of "forcible compulsion" by him to cause Kanniard to perform two separate acts of fellation on Waters. Forcible compulsion means physical force, or a threat, express or implied, of death or physical injury to or kidnapping of any person. All the acts charged against appellants and Leroy Miles, another occupant of the jail cell in the Howard county jail in which Kanniard, Waters and Adams were being held, occurred before daylight on March 4, 1979, after Adams had been moved from another cell. Kanniard weighed 120 pounds. Adams was 29 years of age, six feet five inches tall and weighed 250 pounds. According to Kanniard, he was first attacked by Miles, who was assisted by Waters in pulling Kanniard off a top bunk in the cell. Kanniard related that after Miles had said, "Let's knock him out and take it," Adams had pushed him into a shower, where Miles forcibly committed anal intercourse upon him, and then forced him to commit fellation upon Adams. Kanniard testified that Waters then said that it was his turn and that Adams then caused Kanniard to go to Waters' bunk by threatening injury to him if he did not. Kanniard said that Waters made him perform an act of fellation.

Even if Waters did not make the threats and used no physical force himself, the element of forcible compulsion is present when the acts constituting it are done by an accomplice or accessory in the presence of the accused. See *Warford* v. *State*, 214 Ark. 423, 216 S.W. 2d 781; Ark. Stat. Ann. §§ 41-301 – 303 (Repl. 1977). The record discloses that an instruction on the criminal responsibility of an accomplice was given at the request of appellants or one of them. No objection to the giving of this instruction was made. Kanniard testified that Waters and Miles could have heard, and did hear, the threats made by Adams. He described the size of the jail cell and said that it would have been very dif-

ficult for Miles and Waters not to have heard threats made by Adams. A sketch of the cell was introduced. The jury heard the testimony and saw the sketch. There was substantial evidence from which it could have found forcible compulsion attributable to Waters. Miles, Waters, and Adams acted in concert, if the jury believed Kanniard's testimony.

Appellant Waters makes much of the fact that Kanniard misidentified him as Miles, more than once during the course of the trial. Kanniard, however, was certain that both the defendants in the courtroom were in the jail cell with him. He said he was not sure he could "pick Gregory Waters out." Later, he said that he could be mistaken in distinguishing between Miles and Waters in his identification, and that he could have "mixed them up." On redirect examination, Kanniard was always positive in his identification of Adams. He said that Waters had stayed on his bunk in the cell nearly all the time that they were in that cell and that at the time Waters had some "fuzz" growing on his face. On redirect examination, he said that he was not absolutely sure whether the defendant in the courtroom beside Adams was Miles or Waters. When another person was brought into the courtroom, Kanniard recognized and positively identified him as Miles (who had previously entered a plea of guilty to the charges against him). Kanniard said that this was the first time he had seen Miles since the night of the alleged crimes against him. He then said that the two defendants in the courtoom were Waters and Adams. Resolution of the question of identification was a matter for the jury.

We find the evidence supporting the jury verdict to be substantial. We find no error prejudicial to Adams on any other ground.

The judgments are reversed and the cause remanded.

Mr. Justice Hickman and Mr Justice Stroud dissent.

DARRELL HICKMAN, Justice, dissenting. There are two approved methods of selecting a jury panel in Arkansas, both deemed constitutional. One is a purely random method where every person is selected by numbers. The other, the

one used in this case, is a more selective method where the jury commissioners are advised to use some judgment in selecting people who will serve as jurors:

The majority concedes that there was no evidence of any purposeful discrimination in this case. There is not a hint in the record that the judge or any of the commissioners used or intended to use race as a criterion for selecting or excluding anyone. The only evidence that can be the basis of the majority decision is statistics. The commissioners agreed that the judge told them to select jurors who had the courage of their convictions and who were honest, trustworthy, fair-minded, and impartial. One commissioner was black. He said that he did not use race as a criterion in his selection. He said the judge told them to select good jurors, which to him meant people who would be fair whether black or white.

The other jury commissioners testified in a like manner and it would be fair to conclude from their testimony that it never occurred to any of them that they were supposed to select or exclude anybody because of race. Without any facts or evidence to support its conclusion except some statistics, the majority concludes that the system used in this case amounted to purposeful discrimination.

What did the appellants show? First, they simply made the assertion, "The percentage of black people is not sufficient." The United States Supreme Court said in *Swain* v. *Alabama*, 380 U.S. 202 (1964): "[P]urposeful discrimination may not be assumed or merely asserted. . . . It must be proven." The sheriff testified that he thought the percentage of black people in Howard County was about 20 percent. On appeal, the 1970 Census figures for that county are offered as evidence that the county was composed of 20.32 percent black people. The trial judge did not even have this evidence when he made his ruling. We must find this ruling to be clearly erroneous in order to overturn it.

Second, no evidence at all was offered of past practices in Howard County which might indicate a pattern of invidious discrimination. No evidence was offered of the percentage of black people registered to vote or even the percentage of black

people eligible to vote. There was not a hint that the commissioners resorted to racial discrimination in selecting prospective jurors. In *Patton* v. *Mississippi*, 332 U.S. 463 (1947), it was shown that no Negro had been called for jury service for thirty years.

Arkansas voter registration records do not reflect race so it cannot be argued that those records afforded an opportunity to exclude black people. In *Alexander* v. *Louisiana*, 405 U.S. 625 (1971), the records did reflect the race of those being selected. Certainly the names of black people could give no clue of race. In *Castaneda* v. *Partida*, 430 U.S. 482 (1977), the court found that the names of Mexican-Americans *did* reflect their race.

What we have is a bare assertion of racial discrimination, one set of statistics, and merely an *opportunity* to discriminate. In the *Castaneda* case, on which the majority relies, the court pointed out that the State put on virtually no proof to rebut a comprehensive showing of a ten-year pattern of discrimination. The Court remarked:

> Inexplicably the State introduced practically no evidence. The testimony of the State District Judge dealt principally with the selection of the jury commissioners and the instruction given to them. *The commissioners themselves were not called to testify.* [Emphasis added.]

The commissioners did testify in this case and, unless their testimony is totally disregarded or found to be unworthy of belief, their testimony cannot be ignored. The law requires proof of a racially discriminatory intent before the Equal Protection Clause is violated. *Swain* v. *Alabama, supra*; *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977). There is no such proof in this case.

The majority decision is legally inexplicable to me. I can only understand it because it concerns a sensitive issue, but that is no reason to relax the standards of the law. Racism is not an evil that can be overcome with legal gymnastics. It is best dealt with by confrontation and a determination that equality will have only one meaning.

I would suggest the courts have been wrong to approve the jury selection method used in this case. The majority decision is evidence of just how restrictive the law can be. For the selection to meet the approval of the courts, the jury commissioners are placed in an untenable situation. They must not discriminate and yet the panel they choose must contain a certain percentage of people of a particular race. That is a form of discrimination. The commissioners' intentions, however good and however innocent, will be for naught unless the panel fits a pattern which the courts have ill-defined. It is basically unfair to ask commissioners to be so devious.

It would be better to abandon altogether the idea that such a system will work. If this idea were abandoned, a person's integrity would not be questioned without evidence; criminal defendants would not have to be concerned about the composition of the jury; the courts would not have to constantly deal with this difficult question; and, more importantly, there would be one less problem that would be a divisive instrument among people.

I would suggest that no Arkansas jury should be chosen again as this one was, not because I think it was an unconstitutional jury, since I feel it was constitutional, but because we can ill afford this problem in our criminal justice system.

STROUD, J., joins in this dissent.